**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**LITTLE ROCK DIVISION**

| | | |
|---|---|---|
| PERRY HOPMAN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | **CASE NO. 4:18-CV-00074-KGB** |
| | § | |
| UNION PACIFIC RAILROAD, | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant Union Pacific Railroad ("Union Pacific") files this Brief in Support of its Motion for Summary Judgment.

**I.    INTRODUCTION**

Plaintiff Perry Hopman ("Hopman") is a current Union Pacific employee who recently was promoted from conductor to engineer. In 2008, Hopman was diagnosed with Post Traumatic Stress Disorder ("PTSD") in connection with his military service. Around the time of his diagnosis Hopman sought employment with Union Pacific and was hired as a conductor, a position which is responsible for the safe operation of Union Pacific's trains, in May 2008. Hopman took an extended leave beginning in April 2010 from Union Pacific to perform additional military service. When he returned in 2015, he informed Union Pacific that he had PTSD, but did not request an accommodation for this condition. Hopman then performed his duties without issue for approximately one year and, only then, requested an accommodation. Hopman requested that Union Pacific permit him to bring his dog Atlas to work because it would make him more "comfortable." Union Pacific denied this request. After this denial, Hopman filed his first Charge

of Discrimination ("Charge") with the Equal Employment Opportunity Commission ("EEOC"), but withdrew the Charge on the EEOC's advice because his dog was not fully trained.

Hopman continued to perform his duties without fail or problem for the next approximately one year. After this time, Atlas completed his training and Hopman made another formal request to bring his dog to work aboard a train. Hopman admits that he did not need an accommodation at this time to perform his job—he could perform his job well and safely without an accommodation. Union Pacific again denied Hopman's request. Union Pacific, however, offered Hopman an alternative accommodation, which was working as a conductor in the rail yard rather than on a locomotive so that he could be at home after his work day concluded with Atlas present. Hopman accepted the alternate accommodation, although he subsequently decided to return to his previous job of working on the road as a conductor even though it meant he could not be home with Atlas at the end of each work day. As noted, Hopman recently was promoted to a locomotive engineer position. As with his conductor duties, Hopman believes he can perform his engineer duties without any accommodation.

Despite this, Hopman asserts claims against Union Pacific for failure-to-accommodate under the Americans with Disabilities Act ("ADA") and the Rehabilitation Act of 1973 ("Rehabilitation Act"). Hopman cannot prevail on these claims. To prevail, Hopman must demonstrate that he needs the requested accommodation. Hopman has admitted that he can perform his job perfectly well without an accommodation. That fact alone makes the requested accommodation unreasonable as a matter of law and ends the inquiry as to whether Hopman can prevail under either claim. Accordingly, Union Pacific requests that the Court grant its motion for summary judgment and dismiss this lawsuit.

## II.      FACTUAL BACKGROUND

### A.      Hopman's Military Service Prior to Joining Union Pacific

Hopman joined the U.S. Army in 1993. *See* Hopman Deposition Excerpts ("Hopman Depo.") attached as Exhibit A at 11:2-18. Hopman originally served as an active duty service member, but only spent approximately one and one-half years on active duty. *Id.* He subsequently joined the national guard in Arkansas. *Id.*

In 2006, Hopman deployed to Iraq as a member of the national guard. *Id.* at 9:4-7; 14:12-14. While deployed, Hopman discussed employment at Union Pacific with one of his fellow guardsmen, and was told that it was a great place to work. *Id.* at 14:4-14. On this recommendation, Hopman decided to pursue a railroad career at Union Pacific when he returned from his deployment. *Id.*

At some point after Hopman returned to the United States, a doctor at Fort Hood diagnosed him with PTSD. *Id.* at 26:15-20. This was the first time he was diagnosed with PTSD. *Id.*

### B.      Hopman Accepts Employment at Union Pacific

In May 2008, while still a member of the national guard but after he returned from his deployment, Hopman accepted employment with Union Pacific. *See* Hopman Human Resources Report ("HR Report") attached as Exhibit B; Exhibit A (Hopman Depo.) at 15:22-16:2. He hired on as a conductor at the North Little Rock service unit. Exhibit A (Hopman Depo.) at 15:3-11. It is mandatory that conductors are union members. *Id.* at 20:7-10.

Conductors are "[r]esponsible for train operations and movement[,] [which] [i]ncludes operat[ing] locomotive equipment …." *Id.* at 60:7-16. A conductor's duties include, but are not limited to:

- Pushing, pulling, lifting, and carrying 5 up to 25 pounds frequently, 50 pounds occasionally, and assisting in the infrequent movement of weights of 7 up to 83 pounds. *Id.* at 61:4-67:17.

- Riding railcars and climbing onto equipment. *Id.*

- Applying bilateral use of upper extremities when needed such as maintaining a grip with both hands. *Id.*

- Maintaining balance and coordination on stairs, ladders, uneven terrain, moving equipment, rails, and ballast. *Id.*

- Maintaining three-point contact when holding on a ladder or train. *Id.*

- Working and interacting with others. *Id.*

- Riding at the rear of a car on a ladder. *Id.* at 71:23-72:1.

In addition to these duties, the conductor also spends time outside of the train to walk the train and deal with other problems. *Id.* at 68:12-70:4. This means the conductor must perform his or her duties in extreme weather and face any dangers the weather may pose. *Id.* at 70:20-71:1. Moreover, in many instances, the conductor's only source of light are the train's headlights and his own flashlight. *Id.* at 70:10-19.

As a conductor, Hopman was required to work a variable schedule based on business needs, which included overnight travel. *Id.* at 58:13-16; 21-25. This involved Hopman, as a conductor, pairing up with an engineer to operate Union Pacific's trains. *Id.* at 59:1-15. Due to scheduling limitations, a conductor and engineer team is not constant and usually changes for each run. *Id.*

### C.    Hopman Takes a Leave of Absence from Union Pacific for Military Service

In April 2010, Hopman took a leave of absence from Union Pacific to perform military service. *Id.* at 17:4-7. This would ultimately turn out to be an approximately five year leave. *Id.* at 17:10-15. Hopman deployed to Kosovo during this time and also spent time at his local armory in Benton, Arkansas. *Id.* at 17:16-17; 18:10-11. In addition to a deployment and residing at his local armory, Hopman also received treatment at Walter Reed in Washington, D.C. and participated in an Army PTSD program in San Diego, CA. *Id.* at 18:14-19. Union Pacific continued to pay Hopman approximately $300 to $400 a month during this leave, which represented the difference

4

between Hopman's pay at Union Pacific and the pay he received while serving on military duty. *Id.* at 19:12-21. Hopman medically retired from the Army National Guard in 2015. *Id.* at 28:14-18.

In 2014, prior to returning to work at Union Pacific, Hopman got his dog. *Id.* at 29:2-16. Atlas, a German Rottweiler, was two months old when Hopman got him. *Id.* at 31:5-8; *See* Paws for Effect Letter date April 10, 2017 ("Paws for Effect Letter") attached as Exhibit C.

### D.      Hopman Returns to Union Pacific

Hopman returned from his military leave of absence on or about May 4, 2015. Exhibit B (HR Report); Exhibit A (Hopman Depo.) at 72:21-25. He resumed working as a conductor at the North Little Rock Service Unit after his return. Exhibit A (Hopman Depo.) at 20:21-21:1.

Union Pacific required Hopman to undergo a fitness-for-duty exam when he returned to work. *Id.* at 44:13-25. Union Pacific requires all of its employees who work in a safety sensitive position to undergo a fitness-for-duty exam after returning from an absence of one year or longer. *See* Gengler Deposition Excerpts ("Gengler Depo.") attached as Exhibit D at 13:1-10. While Hopman informed Union Pacific of his PTSD diagnosis at this time, he did not request a reasonable accommodation. Exhibit A (Hopman Depo.) at 39:6-11. This resulted in Union Pacific returning Hopman to work without restrictions. *Id.* at 44:13-25.

### E.      Hopman Requests that Union Pacific Permit him to Bring his Dog to Work While Serving as a Train Conductor

On or about April 1, 2016, after working at Union Pacific without an issue for nearly a year after returning from his military leave of absence and approximately eight years after his PTSD diagnosis, Hopman requested that Union Pacific permit him to bring Atlas to work as a reasonable accommodation. *Id.* at 27:5-19; 34:7-18. This is the first time that Hopman ever sought a reasonable accommodation from Union Pacific. *Id.* at 72:10-17. Hopman readily admits that from

May 4, 2015 to April 1, 2016, prior to requesting this accommodation, he was able to safely perform all functions of his job. *Id.* at 31:22-32:16.

Hopman made this 2016 request to his supervisor at the time, Josh Davis ("Davis"). *Id.* The only disability Hopman claimed at this time was his PTSD. *Id.* Hopman requested to bring his dog to work because it would "allow him to be more comfortable at work, and make work easier for him." *See* April 1, 2016 Values Line Report ("2016 Values Line") attached as Exhibit E.

After reviewing Hopman's request, Union Pacific denied it because it determined that the accommodation would result in a direct threat to health and safety.[1] *See* April 4, 2016 Form C ("2016 Form C") attached as Exhibit F. Specifically, Union Pacific noted that: (1) it is unclear how a dog would react to the dangerous conditions of the railyard, such as moving cars and locomotives; (2) there was no infrastructure to support a dog in a locomotive or on the road; and (3) the dog would remain unmonitored and could pose a risk to other employees. *Id.*

After the denial of this request, Hopman filed a Charge with the EEOC. *See* Charge of Discrimination dated April 21, 2016 and Associated Documents ("2016 Charge") attached as Exhibit G. In his Charge, Hopman alleged that Union Pacific denied him a reasonable accommodation because of his disability. *Id.* In the accompanying Intake Questionnaire, Hopman indicated the only discrimination he faced was Union Pacific's denial of a "use of service dog at work." *Id.* Hopman also indicated that the assistance he sought was "only to allow a service dog to accompany [him] at work." *Id.* At the time Hopman filed this Charge, Atlas had not completed his training. Exhibit A (Hopman Depo.) at 37:1-7. Hopman proactively requested an

---

[1] Union Pacific does not move for summary judgment under a theory of direct threat to health and safety. Indeed, Hopman cannot meet his initial burden and there is no need to reach the direct threat inquiry. Accordingly, Union Pacific provides this information solely for informational purposes.

accommodation he would want in the future. *Id.* at 38:1-5. Given this, the EEOC recommended that Hopman withdraw his Charge, which he did. *Id.* at 37:8-18; Exhibit G (2016 Charge).

**F.     Hopman Makes a Second Request to Bring his Dog to Work While Serving as a Train Conductor**

After Atlas completed his 18-month training program in or about April 2017, Hopman requested again that Union Pacific permit him to bring Atlas to work with him. Exhibit A (Hopman Depo.) at 31:9-11; Exhibit C (Paws for Effect Letter). Hopman initiated this request with an email to Pauline Weatherford ("Weatherford"), one of Union Pacific's senior vocational case managers. *See* Weatherford Deposition Transcript Excerpts ("Weatherford Depo.") attached as Exhibit H at 8:13-19; May 5, 2017 Email ("May 5, 2017 Email") attached as Exhibit I. In that role, Weatherford assists employees with unpaid medical leave for on-duty injuries, manages the vocational rehab program, and facilitates accommodation requests. Exhibit H (Weatherford Depo.) at 8:13-19. Weatherford's role in accommodation requests is to engage in the interactive process with the employee, clarify what the employee is seeking, and assist the employee in acquiring the desired accommodation request, if possible. *Id.* at 8:23-9:10. Weatherford assisted Hopman throughout the life of his accommodation request and beyond. Exhibit A (Hopman Depo.) at 50:8-16; Exhibit H (Weatherford Depo.) at 8:20-22.

In his email to Weatherford, Hopman wrote "[t]he last time we spoke I was in the process of obtaining my service dog. I now have my service dog full time and would like to once again ask for [an] accommodation which would enable me to bring him to work with me." Exhibit I (May 5, 2017 Email). A few days later, with Weatherford's assistance, Hopman completed one of Union Pacific's reasonable accommodation request intake forms. *See* 2017 Union Pacific Form B ("2017 Form B") attached as Exhibit J. In this form, Hopman addressed the concerns Union Pacific expressed in denying his 2016 request. *Id.* Hopman claimed that: (1) Atlas was trained to perform

tasks in varied environments and could receive additional training in the working environment; (2) Atlas was trained to not relieve himself for 12 straight hours; and (3) Atlas was an extension of himself and, because of that, was not a threat to other employees. *Id.* Hopman also claimed in the form that he had physical and mental impairments in the form of "[a]nxiety and fatigue." *Id.* Hopman claimed that these impairments interfered with his ability to perform his job by adversely affecting his ability to interact with others, sleep, concentrate, and remember to take his medications. *Id.* Hopman also claimed that these impairments directly interfered with his work because of "[i]ncreased fatigue due to difficulties sleeping, i.e. anxiety and night terrors [and] … [p]ossible impact on focus." *Id.* However, at the end of the form, Hopman represented that he is "[c]urrently able to function but is experiencing increased anxiety, fatigue and difficulties concentrating when service dog is not present …. Fearful will lead to inability to perform essential functions without the accommodation …." *Id.*

When questioned about this form in his deposition, Hopman testified that he had no job limitations at the time he requested his accommodation. Exhibit A (Hopman Depo.) at 111:16-3. When asked why Hopman requested to bring Atlas to work, despite being able to perform all the essential functions of his job, Hopman claimed he needed Atlas to assist him by:

- Grounding, which is when Atlas senses Hopman's anxiety levels and places pressure on his body. *Id.* at 108:13-16.

- Reminding him to take his mediations. *Id.* at 108:17-21.

- Hovering, which is when Atlas walks circles around Hopman in a crowd to keep the crowd at bay. *Id.* at 108:23:109:1.

- Notifying Hopman of when a migraine is coming. *Id.* at 109:2-3.

- Blocking anyone from approaching Hopman from behind. *Id.* at 109:4-8.

- Finding the closest exit in a building. *Id.* at 109:9-11

- Picking up and retrieving items. *Id.* at 109:12-17.

- Waking Hopman up from nightmares. *Id.* at 109:18-19.

- Forcing Hopman to get out of the house. *Id.* at 109:20-22.

To remain a viable service dog and continue performing these tasks, Atlas requires ongoing training. *Id.* at 89:1-3. This requires Hopman to send Atlas to a trainer, sometimes for up to weeks at a time. *Id.* at 89:4-21. Despite all his training, Hopman recognizes that Atlas was not trained for the railroad environment, complete with all the smells, noises, and safety hazards a service dog would encounter. *Id.* at 135:18-22.

### G.    Union Pacific and Hopman Engage in the Interactive Process

After Hopman submitted his 2017 request for an accommodation, Weatherford and Hopman had many discussions about Hopman's request and his needs. Exhibit H (Weatherford Depo.) at 37:5-14; 113:10-13. Weatherford also researched cases and looked for other information helpful to Hopman and his request. *Id.* at 78:20-79:1; 82:3-8. Hopman admits that Weatherford was not only responsive to his request and communications, but she was also concerned and compassionate about his well-being. Exhibit A (Hopman Depo.) at 74:1-10. Moreover, Hopman unambiguously admits that Weatherford engaged in the interactive process with him. *Id.* at 124:1-6 ("Q. … you interacted with [Weatherford] and provided her with information, right? A. Yes, ma'am").[2] Union Pacific memorialized this process using its internal reasonable accommodation request forms. Exhibit D (Gengler Depo.) at 54:2-6.

Pursuant to Union Pacific's routine processes, Weatherford forwarded Hopman's accommodation request on to the General Superintendent of his service unit, Jay Everett ("Everett"), for review. *See* Everett Deposition Transcript Excerpts ("Everett Depo.") attached as

---

[2] Even though Hopman unambiguously admits that Union Pacific engaged in the interactive process, Union Pacific does not move for summary judgment on this issue because it is immaterial to the outcome of Hopman's claims. Hopman did not need an accommodation.

Exhibit K at 22:12-23:9. Once he received Hopman's request, Everett reviewed it and conferred with Union Pacific's internal legal counsel and safety department. *Id.* at 22:11-23:2; 40:9-50:11. Everett and numerous members of Union Pacific's legal team and safety department collaborated on whether Union Pacific could safely accommodate Hopman's request. *See* Rod Doerr Deposition Transcript Excerpts ("Doerr Depo.") attached as Exhibit L at 153:16-23.

### H.    Union Pacific Denies Hopman's Request to Bring a Dog Aboard a Train But Grants him Another Accommodation

The decision as to whether Union Pacific could provide Hopman with his requested accommodation rested in Everett alone, though Everett could rely on those resources available to him to make the decision. Exhibit K (Everett Depo.) at 33:5-11; 79:11-18; Exhibit L (Doerr Depo.) at 127:13-23; 129:17-21. During this decision making process, Weatherford advocated on behalf of Hopman. Exhibit H (Weatherford Depo.) at 21:6-22:12. She explained to Everett, among others, how well a service animal is trained and a service animal's capabilities. *Id.* Despite this, after his discussions with Union Pacific's internal legal counsel and safety department, Everett made the decision to deny Hopman's request. Exhibit K (Everett Depo.) at 33:5-11. Everett determined that the presence of Atlas would constitute a direct threat to health and safety. *Id.* at 43:3-10; 53:17-54:23; 55:7-56:14; Exhibit H (Weatherford Depo.) at 74:5-6. This was based, in part, on an assessment performed by Union Pacific's Assistant Vice President of Safety, Rod Doerr ("Doerr"). Exhibit L (Doerr Depo.) at 90:2-91:1; 99:12-24. Doerr believed that Hopman would violate a number of safety rules in bringing Atlas aboard a train. *Id.* Union Pacific memorialized Everett's decision by providing Hopman with a document describing the resolution of his reasonable accommodation request. *See* June 22, 2017 Form C ("2017 Form C") attached as Exhibit M. Union Pacific noted that Hopman's original request "would cause an undue hardship … and may result in a direct threat to health and safety …." *Id.*

When Weatherford learned that Everett would not approve Hopman's request to bring Atlas aboard the train, Weatherford began contemplating alternative forms of accommodation. Exhibit H (Weatherford Depo.) at 82:24-83:2. As a result of this, Union Pacific offered Hopman a reasonable accommodation in the form of a yard job. *Id.* at 75:18-5; 83:15-23; 87:4-6; Exhibit A (Hopman Depo.) at 50:17-51:15. A yard job would prevent Hopman from having to spend nights away from home—and from Atlas. Exhibit A (Hopman Depo.) at 54:18-24. Hopman had approximately 25 different yard jobs to choose from. *Id.* at 50:17-51:15. While Hopman theoretically could have sought a yard job on his own using his seniority, Union Pacific's involvement in the process ensured he would keep that job and not be bumped from the job by another Union-represented employee with greater seniority. Exhibit L (Doerr Depo.) at 185:1-14.

Hopman disagreed with Union Pacific's decision. Exhibit M (2017 Form C). According to Hopman, the offered yard accommodation "baffle[d]" him because "[t]he yard is a more dangerous working environment" and "it pays less." *Id.* In addition, Hopman noted that "Atlas does more than just help with … sleeping," Atlas also helped Hopman perform "certain tasks that allow [him] to be a productive person." *Id.*

In a follow-up email to Weatherford, Hopman conveyed his disagreement with Union Pacific's decision because his "request for an accommodation was in no way approved for [the] original request." *See* June 22, 2017 Email ("June 22, 2017 Email") attached as Exhibit N. Hopman further complained that "[t]his form is making it seem like [A]tlas is solely a psych dog, which couldn't be further from reality." *Id.* Hopman followed this with "[y]es I have PTSD, which is part of the need for [the] dog. Not main focus." *Id.* In closing, Hopman wrote "I also never stated that [Atlas] would assist me in essential functions while on duty …" *Id.*

Hopman's disagreement prompted Union Pacific to elevate Hopman's request to Weatherford's supervisor, Peggy Grosskopf ("Grosskopf"), director of clinical services, and Union Pacific's internal EEO team. Exhibit H (Weatherford Depo.) at 13:6-10; 13:22-14:12; 18:8-18; 22:13-16. Grosskopf and the EEO team reviewed Hopman's objections to determine if Union Pacific could alter its decision. *Id.* at 18:8-18. Grosskopf and the EEO team reached the same conclusion as Everett—Union Pacific could not accommodate Hopman's request to bring a dog aboard the train. *Id.* at 24:20-25:2.

Despite his previous protestations, Hopman agreed to pursue the alternative accommodation offered to him. Exhibit A (Hopman Depo.) at 51:21-52:14. He eventually accepted a job as a conductor in the yard. *Id.* at 51:21-52:14; 114:14-16. Contrary to his fear that he would only earn around $50,000 annually and contrary to his claims in his Amended Complaint, Hopman's pay did not radically change when he accepted the yard job as an accommodation. *Id.* at 52:18-53:3. Hopman admits that the allegation in his First Amended Complaint about having to take a lower paying position is untrue. *Id.* at 122:13-17; ECF No. 4, ¶ 14.

Despite voluntarily accepting this reasonable accommodation, Hopman did not like the conductor yard job. Exhibit A (Hopman Depo.) at 53:13-54:11. Hopman felt that this new position placed more stress on him because the yard job conductor is "just a dangerous job" in "a dangerous environment." *Id.* He decided to return to his previous job and resumed working as a conductor on the road. Exhibit L (Doerr Depo.) at 241:2-14.

## I.     Hopman Files a Second EEOC Charge but Does Not Claim PTSD is his Disability

Hopman filed a second Charge against Union Pacific for its failure to accommodate his second request to permit him to bring his dog to work. *See* Charge of Discrimination dated July 13, 2017 and Associated Intake Questionnaire ("2017 Charge") attached as Exhibit O. In this

Charge, Hopman claimed that he "requested to be allowed to use a service dog to accompany [him] when walking train; ride within locomotive in down stay command or could be tethered or crated while switching and be allowed to travel to rest location." *Id.* In the associated Intake Questionnaire form, Hopman claimed that his disability was migraines, anxiety, and depression, not PTSD. *Id.*; Exhibit A (Hopman Depo.) at 49:2-10.

After receiving his Notice of Right to Sue, Hopman filed this lawsuit on January 26, 2018. ECF No. 1. Contrary to what he told the EEOC in the Intake Questionnaire, his only claimed disability in this case is PTSD. Exhibit A (Hopman Depo.) at 120:16-121:2. In emphasizing this, Hopman acknowledges that the only disability at issue in this case is his PTSD. *Id.* at 136:10-12.

**J.     Hopman Continues to Perform his Job Duties Safely Without an Accommodation**

Despite Union Pacific's denial of his request to bring Atlas to work with him, Hopman is adamant that he has been, and continues to be, able to perform all the functions of his job safely. *Id.* at 45:1-25; 57:1-9; 78:2-8; 136:3-6; Exhibit H (Weatherford Depo.) at 28:20-23. He has never reached a point where he is unable to perform the essential functions of his job, even more than a decade after a doctor diagnosed him with PTSD. Exhibit A (Hopman Depo.) at 113:25-114:3. Moreover, nothing in his medical record suggests that he is unable to perform his job without an accommodation. *See* Dr. John Holland Deposition Excerpts ("Holland Depo.") attached as Exhibit P at 78:14-20.

**K.     Union Pacific Promotes Hopman to Engineer and Permits him to Bring his Dog to Training**

Since Hopman filed his Charge and this lawsuit against Union Pacific, Union Pacific has promoted Hopman to engineer. Exhibit A (Hopman Depo.) at 21:9-20. He underwent training to become an engineer, which he was set to complete in or about April 2019. *Id.* at 21:9-16. Hopman requested that Union Pacific permit him to bring Atlas to the classroom portion of the engineer

training. *Id.* at 132:4-133:7. Union Pacific granted him this request because Hopman would not be performing any duties on a train. *Id.* However, Atlas injured himself prior to the training and was unable to accompany Hopman. *Id.* As with his conductor duties, Hopman does not believe that there are any engineer duties he cannot perform without a reasonable accommodation. *Id.* at 43:16-18; 136:7-9; 136:13-17.

**L.    Even After Hopman Filed Suit, Union Pacific Attempted to Work with Hopman**

In mid-2018, Doerr and his safety team agreed to travel to Arkansas to meet with Hopman to discuss Atlas. Exhibit L (Doerr Depo.) at 18:6-12; 88:16-89:10. The intent of this meeting was to allow Hopman to demonstrate how he would mitigate all the safety concerns associated with Atlas's presence onboard a locomotive. *Id.* at 88:16-89:10. However, Hopman cancelled the meeting the day before it was set to occur. *Id.*

In addition, Weatherford continued to work with Hopman on his request for an accommodation. Exhibit H (Weatherford Depo.) at 89:15-17. As recently as September 2018, Weatherford and Hopman exchanged emails about the potential for Atlas to accompany Hopman at work. *See* 2018 Interactive Process Emails ("2018 Emails") attached as Exhibit Q. In these emails, Hopman and Weatherford discussed how Hopman planned to overcome issues presented by Atlas's presence. *Id.* Hopman summed up these discussions by writing "Atlas has really helped me avoid flashbacks and the like, due to my PTSD. I know that he will make me an even better worker …." *Id.* Hopman recently raised the issue of rescheduling the workplace demonstration with Union Pacific. However, this has not occurred to date because his attorneys would not agree to having Hopman do a demonstration and would not agree to having the workplace meeting unless Hopman's dog trainer also could attend.

### III.    SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Id.* at 323. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. *Id.*

A party seeking summary judgment always bears the initial responsibility of informing this Court of the basis for its motion and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Id.* One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and it should be interpreted in a way that allows it to accomplish this purpose. *Id.* at 324. There is no "discrimination case exception" to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011).

## IV.    ARGUMENT AND AUTHORITIES

### A.    Hopman's Claims Under the ADA and Rehabilitation Act are Subject to the Same Analysis

Hopman brings identical claims under the ADA and Rehabilitation Act. ECF No. 4. Hopman's Rehabilitation Act claim and his ADA claim are subject to the same analysis. *Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013) ("As relevant to the issues here, decisions interpreting either the ADA or the Rehabilitation Act are applicable and 'interchangeable' to claims under each statute.") (citing *Neudecker v. Boisclair Corp.*, 351 F.3d 361, 363–64 (8th Cir. 2003); *Allison v. Dep't of Corr.*, 94 F.3d 494, 497 (8th Cir. 1996)). The only relevant difference between the claims is the burden of proof imposed on the plaintiff. *Amir v. St. Louis Univ.*, 184 F.3d 1017, 1029 n. 5 (8th Cir. 1999) ("Rehabilitation Act claims are analyzed in a manner similar to ADA claims except that the Rehabilitation Act imposes a requirement that a person's disability serve as the sole impetus for a defendant's adverse action against the plaintiff."). Accordingly, UP addresses Hopman's ADA and Rehabilitation Act claims in tandem.

### B.    Hopman's Failure-to-Accommodate Claim Under the ADA and Rehabilitation Act Fails Because He has No Need for the Requested Accommodation and Cannot Present a Prima Facie Case of Disability Discrimination

#### 1.    Legal Standard for Failure to Accommodate Claim

"The ADA makes it unlawful for a covered employer to discriminate against any 'qualified individual on the basis of disability.'" *Hill*, 737 F.3d at 1216 (quoting 42 U.S.C. § 12112(a)). Discrimination under the ADA includes, in relevant part, "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5). "A plaintiff thus can bring claims under the ADA for failure to accommodate …." *Orr v. City of Rogers*, 232 F. Supp. 3d 1052, 1060 (W.D. Ark. 2017), reconsideration denied, 5:15-CV-05098, 2017 WL 772913 (W.D. Ark. Feb. 27, 2017).

In a reasonable accommodation case, the "discrimination" is framed in terms of the failure to fulfill an affirmative duty—the failure to reasonably accommodate the disabled individual's limitations. *Peebles v. Potter*, 354 F.3d 761, 767 (8th Cir. 2004). Reasonable accommodation claims are not analyzed using the *McDonnell Douglas* rubric. *Id.* (internal citations omitted). "This is so because a claim against an employer for failing to reasonably accommodate a disabled employee does not turn on the employer's intent or actual motive." *Id.* at 766.

Instead, the Eighth Circuit has prescribed a modified burden-shifting analysis in which a plaintiff "must establish **both** a prima facie case of discrimination based on disability and a failure to accommodate it." *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 905 (8th Cir. 2015) (emphasis added). The plaintiff then has the burden to show "that the requested accommodation is 'reasonable on its face, i.e., ordinarily or in the run of cases.'" *Peebles*, 354 F.3d at 768 (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002)). "Upon such a showing, the employer is left to 'show special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances.'" *Id.* (quoting *Barnett*, 535 U.S. at 402, 122 S.Ct. 1516). Hopman is unable to meet this standard. He cannot establish a prima facie case of disability discrimination because he did not need the requested accommodation.

### 2. Hopman Cannot Demonstrate He Needs the Requested Accommodation

As an initial matter, Hopman's claim fails because he does not need the requested accommodation. It is well settled in the Eighth Circuit that "[w]here the reasonable accommodation requested is unrelated to the limitation, … an ADA action may [not] lie. Put another way, there must be a causal connection between the major life activity that is limited and the accommodation sought." *Wood v. Crown Redi-Mix, Inc.*, 339 F.3d 682, 687 (8th Cir. 2003); *Liljedahl v. Ryder Student Transp. Services, Inc.*, 341 F.3d 836, 842 (8th Cir. 2003) (same); *see*

*also Burchett v. Target Corp.*, 340 F.3d 510, 517 (8th Cir. 2003) (granting summary judgment where "[the defendant] argue[d] that it was not required to [accommodate the plaintiff] because she could perform her current job with the reasonable accommodations it was providing."). "A reasonable accommodation is one which ***enables a[n] individual with a disability to perform the essential functions of the position***." *Hatchett v. Philander Smith College*, 251 F.3d 670, 675 (8th Cir. 2001) (emphasis added). These holdings were aptly summarized by the Honorable Kermit E. Bye in his concurrence in *Peebles*, in which he stated "[a]s our precedent stands, moreover, the plaintiff fails to make a prima facie case if he fails to show he ***needs*** an accommodation." 354 F.3d at 770–71 (emphasis in original). Thus, "because necessity is part of the prima facie case, the showing the plaintiff needs the accommodation precedes the question whether the accommodation was reasonable." *Id.*

The Eighth Circuit's precedent conforms with the ADA's supporting regulations. As noted by the U.S. Supreme Court, those regulations state that a reasonable accommodation is one that provides:

> "(i) [m]odifications or adjustments to a job application process that ***enable*** a qualified applicant with a disability ***to be considered for the position*** such qualified applicant desires; or
>
> "(ii) [m]odifications or adjustments to the work environment ... that ***enable*** a qualified individual with a disability ***to perform the essential functions of that position***; or
>
> "(iii) [m]odifications or adjustments that ***enable*** a covered entity's employee with a disability ***to enjoy equal benefits and privileges of employment*** as are enjoyed by its other similarly situated employees without disabilities."

*Barnett*, 535 U.S. at 417 (citing 29 CFR § 1630.2(o) (2001)) (emphasis added). The EEOC's Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act provides guidance as to what "equal benefits and privileges of employment" means:

> The ADA requires employers to provide reasonable accommodations so that employees with disabilities can enjoy the "benefits and privileges of employment" equal to those enjoyed by similarly-situated employees without disabilities. Benefits and privileges of employment include, but are not limited to, employer-sponsored: (1) training, (2) services (e.g., employee assistance programs (EAP's), credit unions, cafeterias, lounges, gymnasiums, auditoriums, transportation), and (3) parties or other social functions (e.g., parties to celebrate retirements and birthdays, and company outings). If an employee with a disability needs a reasonable accommodation in order to gain access to, and have an equal opportunity to participate in, these benefits and privileges, then the employer must provide the accommodation unless it can show undue hardship.

Available at: https://www.eeoc.gov/policy/docs/accommodation.html#N_44_. Ultimately, it is unlawful for a covered entity not to make reasonable accommodation to the known *physical or mental limitations* of an otherwise qualified applicant or employee with a disability. 29 C.F.R. § 1630.9(a) (emphasis added).

Here, Hopman cannot meet the requirement of showing he needs an accommodation for any limitation, much less one that relates to the performance of his job or his enjoyment of the equal benefits of employment. To the contrary, Hopman has consistently represented that he could perform the essential functions of his job as a conductor without an accommodation. Exhibit A (Hopman Depo.) at 45:1-25; 57:1-9; 78:2-8; 113:25-114:3; 136:3-6; Exhibit H (Weatherford Depo.) at 28:20-23. He also admitted that at the time he requested an accommodation, he had no limitations that prevented him from completing his job duties. Exhibit A (Hopman Depo.) at 111:16-3. In addition, nothing in his medical record suggests that he is unable to perform his job without an accommodation. Exhibit P (Holland Depo.) at 78:14-20. Hopman also has not, and cannot, demonstrate that there are any equal benefits of employment that he is unable to enjoy without an accommodation. His alleged disability does not prevent him from enjoying anything Union Pacific has to offer.

Hopman's ability to perform his essential job functions is made further apparent by his recent promotion. Not only has Hopman met the requirements of his job as a conductor without an

accommodation—he has excelled. Exhibit A (Hopman Depo.) at 21:9-20. Hopman also agrees

that, as with his conductor duties, Hopman will be able to excel at performing his engineer duties

without a reasonable accommodation. *Id.* at 43:16-18; 136:7-9; 136:13-17. Accordingly, because

Hopman cannot show that his request to bring a dog to work relates to any limitation he has on the

job, he cannot present a prima facie case of disability discrimination and his claim fails.

### 3.      Hopman Cannot Present a Prima Facie Case of Discrimination Because He Suffered No Adverse Employment Action

Even if Hopman requested to bring a dog to work to address a specific work limitation, he

cannot independently present a prima facie case of discrimination. To establish a prima facie case

of discrimination based on a disability, Hopman must show that he "(1) is disabled within the

meaning of the ADA; (2) is a qualified individual under the ADA; and (3) has suffered an adverse

employment decision because of the disability." *Schaffhauser*, 794 F.3d at 905 (citing *Kallail v.

Alliant Energy Corp. Servs., Inc.*, 691 F.3d 925, 930 (8th Cir. 2012)). For purposes of summary

judgment only, Union Pacific assumes that Hopman can meet the first two elements of his prima

facie claim. However, Hopman cannot demonstrate that he suffered an adverse employment

decision.

The Eighth Circuit has noted that "[a]n employer is … liable for committing an adverse

employment action if the employee in need of assistance actually requested but was denied a

reasonable accommodation." *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1060 (8th Cir. 2016)

(*Hatchett v. Philander Smith College*, 251 F.3d 670, 675 (8th Cir. 2001)).[3] *See also Mershon v. St.

Louis Univ.*, 442 F.3d 1069, 1077 (8th Cir. 2006) (citing *Peebles*, 354 F.3d at 766) (holding

---

[3] While the Eighth Circuit cites to *Hatchett* to support this contention, *Hatchett* does not address whether a failure-to-accommodate alone constitutes an adverse employment action.

"[b]ecause the alleged failure to accommodate is the adverse action and no other act is claimed as discriminatory, there is no requirement to demonstrate any adverse action other than the failure to accommodate itself.").[4] However, this is not a standard that is universally followed in the Circuit. *See, e.g., Donnelly v. St. John's Mercy Med. Ctr.*, 635 F. Supp. 2d 970, 995 (E.D. Mo. 2009) (granting summary judgment where plaintiff could not demonstrate an adverse employment action beyond the denial of an accommodation).

In the context of the Rehabilitation Act, "[i]t is also important to note that the 'person's disability [must] serve as the ***sole*** impetus for a defendant's adverse action against the plaintiff.'" *Wojewski v. Rapid City Reg'l Hosp., Inc.*, 450 F.3d 338, 344 (8th Cir. 2006) (quoting *Amir*, 184 F.3d at 1029 n.5) (emphasis in original). Indeed, where a plaintiff cannot show that the adverse employment action was due solely to the plaintiff's disability, summary judgment is appropriate. *Dick*, 826 F.3d at 1060 (holding summary judgment appropriate because "[plaintiff] did not suffer any adverse employment actions due to her disability.").

Here, the only potential adverse employment action Hopman can rely on is the denial of his accommodation request.[5] Even if Hopman relies on the Eighth Circuit opinions holding that the denial of an accommodation constitutes an adverse employment action, that line of cases holds that it is an adverse employment action only if the employee: (1) "[is] in need of assistance …" and (2) "was denied a reasonable accommodation." *Dick.*, 826 F.3d at 1060. Hopman cannot meet either of these requirements.

---

[4] Once again, while the Eighth Circuit cites to *Peebles* for this contention, *Peebles* does not independently address whether a failure-to-accommodate alone constitutes an adverse employment action.

[5] Hopman cannot predicate his move to a yard job as an adverse employment action. According to the Eighth Circuit, a voluntary change in a job cannot constitute an adverse employment action. *Fenney v. Dakota, Minnesota & E. R. Co.*, 327 F.3d 707, 717 (8th Cir. 2003) (holding that "plaintiff cannot state an adverse employment action if he voluntarily resigned …."). Hopman admits he voluntarily moved into the yard. Exhibit A (Hopman Depo.) at 53:13-54:11.

First, as explained in more detail above, Hopman was not in need of any assistance to perform his job duties. He had no limitations that required an accommodation. Rather, he unambiguously admits that he was able, and remains able, to perform the essential functions of his job without an accommodation. Exhibit A (Hopman Depo.) at 45:1-25; 57:1-9; 78:2-8; 113:25-114:3; 136:3-6. Thus, under Eighth Circuit precedent, the denial of an unnecessary accommodation is not an adverse employment action.

Second, Hopman was not denied a reasonable accommodation. Although it could not permit him to bring a dog aboard a train, Union Pacific offered Hopman a reasonable accommodation in the form of a yard job. Exhibit H (Weatherford Depo.) at 75:18-5; 83:15-23; 87:4-6; Exhibit A (Hopman Depo.) at 50:17-51:15. This allowed Hopman to hold a yard job he may not otherwise be entitled to, which prevented Hopman from having to spend nights away from home—and from Atlas. Exhibit A (Hopman Depo.) at 54:18-24. Hopman voluntarily accepted this alternative accommodation offered to him. *Id.* at 51:21-52:14.

In addition to this accommodation, Union Pacific also granted Hopman's request that Atlas accompany him to his engineer training. *Id.* at 132:4-133:7. Union Pacific's safety concerns were allayed with Hopman's training because it occurred in a class room. *Id.* Accordingly, Hopman cannot demonstrate that he was denied a reasonable accommodation.

In the context of the Rehabilitation Act, Hopman cannot meet the requisite showing that the denial of his accommodation request was due solely to his PTSD. The available evidence demonstrates that Union Pacific denied his request due to safety concerns, not due to his PTSD. In individually assessing the potential presence of Atlas, Everett determined that Atlas would constitute a direct threat to health and safety. Exhibit K (Everett Depo.) at 43:3-10; 53:17-54:23; 55:7-56:14; Exhibit H (Weatherford Depo.) at 74:5-6; Exhibit M (2017 Form C). This decision

was made with input from Union Pacific's Vice President of Safety, Doerr, who opined that Atlas's presence would cause Hopman to violate a number of safety rules. Exhibit L (Doerr Depo.) at 90:2-91:1; 99:12-24. Accordingly, there is no evidence that the sole reason Union Pacific denied Hopman's request for permission to bring Atlas aboard a train was due to his PTSD.

### 4. Hopman's Requested Accommodation was not Reasonable as a Matter of Law

Even if Hopman could show that he needed a dog to address a limitation he had at work and establish a prima facie case of disability discrimination, Hopman must demonstrate that his requested accommodation was reasonable. An accommodation is not reasonable if it does not assist the plaintiff in "performing the duties of her particular job …." *Rask v. Fresenius Med. Care N. Am.*, 509 F.3d 466, 471 (8th Cir. 2007) ("The ability to take sudden, unscheduled absences would not have assisted [plaintiff] in performing the duties of her particular job; they would have been for her personal benefit."). "A reasonable accommodation is one which e***nables a[n] individual with a disability to perform the essential functions of the position***." *Hatchett v. Philander Smith Coll.*, 251 F.3d 670, 675 (8th Cir. 2001) (citing 29 C.F.R. § 1630.2(o)(1)(i)) (emphasis added). It must be "plainly obvious" that the accommodation is reasonable. *AP ex rel. Peterson v. Anoka-Hennepin Indep. Sch. Dist. No. 11*, 538 F. Supp. 2d 1125, 1148 (D. Minn. 2008) ("On this record, then, no reasonable jury could find that it was plainly obvious' that the glucagon-injection request was a reasonable accommodation.").

As discussed above, Hopman's requested accommodation is unrelated to his limitations or his ability to perform his job duties because he has no limitations. Exhibit A (Hopman Depo.) at 45:1-25; 57:1-9; 78:2-8; 113:25-114:3; 136:3-6. In his own words, his requested accommodation would simply make him more "comfortable" and "an even better worker …." Exhibit F (2016 Values Line); Exhibit Q (2018 Emails).

Moreover, Hopman admitted in an email to Weatherford that the "main focus" of Atlas was not his PTSD, which is the ***only*** disability he has claimed in this lawsuit. Exhibit N (June 22, 2017 Email). He also reaffirmed that Atlas would not help him with his essential job functions at all. *Id.* The only reasonable way to interpret this is that Hopman wants Atlas to accompany him to work for reasons unrelated to his disability; or, in his words, to make him "comfortable." This is, according to the Eighth Circuit, the very definition of an unreasonable accommodation. *Hatchett*, 251 F.3d at 675.

## V.       CONCLUSION

Hopman does not need a reasonable accommodation. He is able to perform, and excel at, his job duties without one. This alone is fatal to his claim. Even if he did need a reasonable accommodation, he cannot demonstrate that Union Pacific failed to provide him with one. In fact, Hopman voluntarily accepted the accommodation offered to him. He only complains that he wanted Union Pacific to give him the specific accommodation he requested. Lastly, the accommodation that Hopman requested was not, on its face, reasonable. Hopman admits that he requested the accommodation for his comfort and to be a better worker, not because he needed the accommodation. Based on these facts, Union Pacific is entitled to summary judgment dismissing this lawsuit.

DATED:  June 24, 2019

Respectfully submitted,

/s/ Linda C. Schoonmaker
Linda C. Schoonmaker
Texas Bar No. 17806300
lschoonmaker@seyfarth.com
Brian A. Wadsworth
Texas Bar No. 24075231
bawadsworth@seyfarth.com
SEYFARTH SHAW, LLP
700 Milam Street, Suite 1400
Houston, Texas 77002
Telephone: (713) 225-2300
Facsimile: (713) 225-2340

AND

Torry N. Garland, #21624
Union Pacific Railroad Company
1400 Douglas Street
Omaha, NE 68179
Telephone: (402) 544-3135
Fax: (402)-997-4760
tngarlan@up.com

**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of June, 2019 I electronically filed the foregoing with the Clerk of Court using the CM/ECF System which will send notification of such filing to all counsel of record.

/s/ Linda C. Schoonmaker
Linda C. Schoonmaker