# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION

PERRY HOPMAN,                      )
                                   )
            PLAINTIFF,             )
                                   ) CASE NO.
VS.                                ) 4:18-CV-00074-KGB
                                   )
UNION PACIFIC RAILROAD,            )
                                   )
            DEFENDANT.             )

------------------------------------

ORAL DEPOSITION OF

PERRY A. HOPMAN

March 25, 2019

------------------------------------


    ORAL DEPOSITION OF PERRY A. HOPMAN, produced as a

witness at the instance of the DEFENDANT, and duly

sworn, was taken in the above-styled and numbered

cause on the 25th day of March, 2019, from 9:07 a.m.

to 2:20 p.m., before Dana Hayden, CCR in and for the

State of Arkansas, RMR, CRR, CRC, reported by machine

shorthand, at 650 South Shackleford Road, Suite 411,

Little Rock, Arkansas, pursuant to the Federal Rules

of Civil Procedure.

1                        APPEARANCES

2      FOR THE PLAINTIFF:

3          MS. LINDA C. SCHOONMAKER
           Seyfarth Shaw, LLP
4          700 Milam Street, Suite 1400
           Houston, Texas 77002
5          713-225-2300
           Schoonmaker@seyfarth.com
6

7      FOR THE DEFENDANT UNION PACIFIC RAILROAD :

8          MS. KATHERINE L. BUTLER
           Butler & Harris
9          1007 Heights Boulevard,
           Houston, Texas 77008
10         Kathy@butlerharris.com

11

12

13     ALSO PRESENT:

14         Atlas

15

16

17

18

19

20

21

22

23

24

25

1    Q.    In the -- I'm going to call it the Middle East.

2    Is that the right way to phrase it?

3    A.    Yes, ma'am.

4    Q.    Okay.  How many tours?

5    A.    One tour to Iraq.

6    Q.    Anywhere else?

7    A.    I toured in Kosovo.

8    Q.    Anywhere else?

9    A.    Not in the Middle East.  No, ma'am.

10   Q.    Okay.  Where were you besides the Middle East?

11   A.    I worked Hurricane Katrina.

12   Q.    Any other tours?

13   A.    We would help put out local fires with our

14   helicopters.  But I don't -- that's not classified as

15   a tour, I don't reckon.

16   Q.    And where were you stationed other than

17   overseas -- we'll just call it overseas and New

18   Orleans.  Where were you stationed in the military?

19   A.    I was stationed at Fort Sam Houston, Texas, and

20   here in North Little Rock, Arkansas.

21   Q.    What's the base here?

22   A.    Camp Joseph T. Robinson.

23   Q.    What was your rank at the time you were

24   medically retired?

25   A.    Staff sergeant.

1    A.    Yes.

2    Q.    Okay.  So when did you stop working full time

3    for the Army?

4    A.    1994.

5    Q.    Okay.  So you joined the Army in '93.  You

6    served two years?

7    A.    It was about a year and a half.

8    Q.    Okay.  And then what changed that you did not

9    continue in the Army full time?

10   A.    Contract breach.

11   Q.    What does that mean?

12   A.    What was listed in my contract that I was

13   guaranteed I was not given, so I had the option of

14   leaving.

15   Q.    Okay.  But then you said you went on for 19

16   years.  So did you stay in another capacity in the

17   Army?

18   A.    I joined the National Guard.

19   Q.    Okay.  So when you say you medically retired,

20   you medically retired from the National Guard, not the

21   Army?

22   A.    It was -- it's actually considered an active

23   duty retirement.

24   Q.    Okay.  And so is that from the Army or from the

25   National Guard?

1    A.    Seven years.

2    Q.    What did you do next?

3    A.    Union Pacific.

4    Q.    Why did you decide to join the Union Pacific

5    Railroad Company?

6    A.    Well, I worked with a guy in Iraq that worked

7    for Union Pacific, and he was talking about the

8    company and, you know, how great it was and how it

9    was -- how it almost mirrored the Army in a way.  And

10   when I decided that firefighting was no longer my

11   future, I decided to give the railroad a chance.

12   Q.    When were you in Iraq that you got to talk with

13   this fellow soldier about UP?

14   A.    From -- it was OIF-0608.  So 2006 to 2008.

15   Q.    And were you a firefighter, then, at the same

16   time?

17   A.    Correct.

18   Q.    And were you on leave to serve?

19   A.    Yes, ma'am.

20   Q.    Was that your first tour in Iraq?

21   A.    Yes, ma'am.

22   Q.    And your first and only tour in Iraq?

23   A.    Yes, ma'am.

24   Q.    Okay.  Had you been on a tour before?

25   A.    No, ma'am.

1   Q.    And this was as a member of the National Guard?

2   A.    Correct.

3   Q.    What did you hire on as at UP?

4   A.    Conductor.

5   Q.    And during your entire Union Pacific career,

6   you've worked in the North Little Rock -- is it still

7   a service unit?

8   A.    Yes, ma'am.

9   Q.    Okay.  You've worked in the North Little Rock

10  service unit?

11  A.    Yes, ma'am.

12  Q.    So if you look at the third page of Exhibit 1,

13  which is very tiny letters and numbers, towards the

14  middle of the page, you see where it says UP Hopman 3,

15  middle of the page?

16  A.    Yes, ma'am.

17  Q.    That's the identifying number we put on a

18  document.  These are very small.  Okay?  All right.

19  So this is UP Hopman 3, and 3 are what we call your

20  work history.  I will represent to you that these are

21  not always 100 percent correct.

22              But according to UP Hopman 3, you hired

23  on in May of 2008.  And going up the page, throughout

24  2008, you were listed as either a thru freight

25  brakeman or a switchman brakeman in either North

1    Little Rock or Pine Bluff, Arkansas.  Do you see that?

2    A.    Yes, ma'am.

3    Q.    Okay.  And then going back one page to

4    UP Hopman 2, it shows that at the end of 2008, you

5    were furloughed.  What does that mean?

6    A.    Laid off.

7    Q.    Okay.  And then it says 1-22-2009, it says you

8    returned from furlough but then it says "susp. RRB."

9    Do you know what that means?

10   A.    No, ma'am.

11   Q.    Okay.  So do you remember what happened in your

12   Union Pacific career when you came back in January of

13   2009?

14   A.    No, ma'am.

15   Q.    Okay.  And then it shows you were furloughed

16   again in March of 2009; is that correct?

17   A.    Yes, ma'am.

18   Q.    And then you were off work for about a year at

19   that point in time; is that accurate?

20   A.    I don't think so.

21   Q.    Okay.  Because this said that you were

22   furloughed in March of 2009 and you returned from

23   furlough in April of 2010.  You're thinking that's

24   incorrect?

25   A.    I'm not sure.

1    Q.    Okay.  Do you remember being furloughed for an

2    extended period of time?

3    A.    No, ma'am.

4    Q.    Okay.  Then moving on to April of 2010, you went

5    on a leave of absence for the military; is that

6    correct?

7    A.    Yes, ma'am.

8    Q.    And how long were you on that military leave?

9    A.    Until 2015.

10   Q.    Okay.  So from April 11th of 2010 until April

11   15th of 2015, you were on military leave from the

12   Union Pacific; is that correct?

13   A.    That's correct.

14   Q.    Roughly five years, correct?

15   A.    Yes, ma'am.

16   Q.    Is that when you went to Kosovo?

17   A.    Yes, ma'am.

18   Q.    Were you in Kosovo the whole time?

19   A.    No, ma'am.

20   Q.    Where else did you go?

21   A.    Nowhere.

22   Q.    Were you in Kosovo the whole time?

23   A.    No, ma'am.

24   Q.    Okay.  Where were you during those five years?

25   A.    I was at Walter Reed Medical Center.

1   Q.   Got it.

2   A.   Oasis Program, National Intrepid Center of

3   Excellence.

4   Q.   And what is that?

5   A.   That's a -- that's, like, the traumatic brain

6   injury hub of the Army, even though it's a Navy base.

7   Q.   Okay.  Where else were you during that five-year

8   period?

9   A.   Home.

10   Q.   Anywhere else?

11   A.   The local armory in Benton, Arkansas.

12   Q.   Anywhere else?

13   A.   I don't think so.  No, ma'am.

14   Q.   Okay.  How long were you in Walter Reed?

15   A.   A month.

16   Q.   And how long were you in the Oasis Program?

17   A.   I think it was four months.

18   Q.   And what is the Oasis Program?

19   A.   Oasis Program is a PTSD program in San Diego.

20   Q.   And how long were you in the National Intrepid

21   program?

22   A.   That was about a month.

23   Q.   And how long were you assigned to the local

24   armory?

25   A.   In total, three or four years.

1    Q.    How long were you in Kosovo?

2    A.    A year.

3    Q.    During that five-year period, you remained an

4    employee of the Union Pacific; is that right?

5    A.    Correct.

6    Q.    During that five-year period, however, you did

7    not receive any pay from the Union Pacific; is that

8    correct?

9    A.    No, ma'am.

10   Q.    That's not correct?

11   A.    That's not correct.

12   Q.    What did you receive from the Union Pacific?

13   A.    I received approximately 3- to $400 a month.

14   Q.    Okay.  Do you know why you received 3- to $400 a

15   month?

16   A.    Yes, ma'am.

17   Q.    Can you tell me why?

18   A.    It was differential pay between my base pay and

19   some formula that Union Pacific uses.

20   Q.    Your base pay in the service?

21   A.    In the service.

22   Q.    So a benefit for people who are Union Pacific

23   employees who are serving; is that right?

24   A.    I don't know if it's a benefit.

25   Q.    Well, you got 3- to $400 a month, right?

    1    A.    Yes, ma'am.

    2    Q.    Okay.  Did you receive anything else from Union

    3    Pacific during that time?

    4    A.    Care packages.

    5    Q.    Anything else?

    6    A.    I don't think so.  No, ma'am.

    7    Q.    Okay.  Are you a union member?

    8    A.    Yes, ma'am.

    9    Q.    Which union?

   10    A.    The UTU.

   11    Q.    Have you been a member of the UTU since you

   12    became a Union Pacific employee or shortly thereafter?

   13    A.    Yes, ma'am.  It's a requirement.

   14    Q.    Did you maintain your union membership while you

   15    were serving that five years?

   16    A.    Yes, ma'am.

   17    Q.    Paid dues?  Did you have to pay dues?

   18    A.    No, ma'am.

   19    Q.    Why not?

   20    A.    Because I was off military service.

   21    Q.    Okay.  When you returned to the Union Pacific

   22    from your service in 2015, did you return to the North

   23    Little Rock service unit?

   24    A.    Yes, ma'am.

   25    Q.    Also as a conductor?

1    A.    Yes, ma'am.

2    Q.    And since that time, have you been off work on

3    any leave?

4    A.    No, ma'am.

5    Q.    Been furloughed?

6    A.    No, ma'am.

7    Q.    Okay.  Are you still a conductor?

8    A.    Kind of.

9    Q.    Okay.  Explain to me your answer, please.

10   A.    I'm in the fireman-in-training course currently

11   to become an engineer.

12   Q.    That's a conductor to engineer progression,

13   correct?

14   A.    Yes.  Yes, ma'am.

15   Q.    You finish that course in April?

16   A.    Yes, ma'am.

17   Q.    Do you know when?

18   A.    I don't know the exact date.  No, ma'am.

19   Q.    And what happens after you finish that course?

20   A.    I become an engineer.

21   Q.    Do you start at the bottom of the engineer

22   seniority roster?

23   A.    No, ma'am.

24   Q.    Explain to me where you start.

25   A.    I will start where the rest of my hiring class

1    deposition.  Exhibit 2 consists of a number of pages

2    relating to a charge of discrimination you filed with

3    the Equal Employment Opportunity Commission in April

4    of 2016.  Do you see that?

5    A.    Yes, ma'am.

6    Q.    The first page of Exhibit 2 marked UP Hopman 652

7    is your charge of discrimination apparently dated

8    April 21, 2016, to the EEOC contending that you had

9    experienced disability discrimination from the Union

10   Pacific beginning in April of 2016.  Do you see that?

11   A.    Yes, ma'am.

12   Q.    You say, or someone typed in the narrative, "I

13   was hired on or about May 5th, 2018, as a conductor.

14   On or about 2008, I was diagnosed with disabilities."

15   Now, what were your disabilities that you were

16   diagnosed with in 2008?

17   A.    PTSD.

18   Q.    And who diagnosed you with that?

19   A.    I think it was a doctor at -- might have been

20   Fort Hood.

21   Q.    Okay.  This was before you went on your extended

22   military leave in 2010, correct?

23   A.    Correct.

24   Q.    Okay.  So did the doctor tell you what the

25   source -- without going into a great deal of detail,

1    what the source of your PTSD was back in 2008?

2    A.    Yes, ma'am.

3    Q.    What was it?

4    A.    Just doing my job in the military.

5    Q.    You said, "On or about April 1, 2016, I

6    requested to be allowed to use a service dog as a

7    reasonable accommodation."  Who did you make that

8    request to?

9    A.    My manager at the time.

10   Q.    And who was that manager?

11   A.    Josh Davis.

12   Q.    And you say that shortly thereafter, your

13   request was denied.  Did Mr. Davis deny it to you?

14   A.    No, ma'am.

15   Q.    Who denied it?

16   A.    I'm not sure.

17   Q.    Do you remember how you received notification

18   that it was denied?

19   A.    Mr. Davis informed me.

20   Q.    The next page of Exhibit 2, UP Hopman 655, dated

21   5-21-16, says, "Walk in interview with Perry Hopman

22   versus Union Pacific Railroad."

23             MS. BUTLER:  Linda, it says 4-21.

24             MS. SCHOONMAKER:  I'm sorry.  Did I say

25         the wrong one?

1           MS. BUTLER:  Yeah.  You said 5-21.

2           MS. SCHOONMAKER:  I apologize.

3           MS. BUTLER:  Yeah.  That's all right.

4    Q.    (By Ms. Schoonmaker:)  UP Hopman 655 is dated

5    4-21-16.  Thank you for correcting my error.  And it

6    is a two page document that continues onto UP Hopman

7    656.  It appears to be notes of the EEOC investigator

8    of the interview he conducted with you; is that

9    correct?

10   A.    Yes, ma'am.

11   Q.    All right.  Did you review this document in

12   connection with preparing for your deposition?

13   A.    No, ma'am.

14   Q.    Okay.  This says, "CP," that's you, charging

15   party, has served in the Army National Guard for 18

16   and a half years and you were medically retired from

17   the Army National Guard in 2015; is that correct?

18   A.    Yes, ma'am.

19   Q.    Okay.  Skipping down to the paragraph that

20   starts "CP said that psychiatrist and neurologist told

21   him that he will benefit if he uses a service dog.  CP

22   states that his service dog is in training for six

23   months.  CP said he is being proactive and wants to

24   start working with the dog."  When did you first

25   consider getting Atlas?

1   A.     Oh, let me think.  I'd say probably around 2012.

2   Q.     When did you actually get Atlas?

3   A.     I got Atlas 2014.

4   Q.     And what were you doing for employment back in

5   2014?

6   A.     I was in the Army.

7   Q.     You were not working at Union Pacific; is that

8   correct?

9   A.     Well, I worked for Union Pacific, but I wasn't

10   working for Union Pacific.

11   Q.     You were an employee of Union Pacific, but you

12   weren't at work; is that fair to say?

13   A.     Yes, ma'am.

14   Q.     Because you didn't get back at work until May of

15   2015 roughly?

16   A.     Correct.

17   Q.     Okay.  All right.  And why did you begin

18   considering getting Atlas in 2012?

19   A.     My medical team at the time really thought I'd

20   benefit from a service animal.

21   Q.     So why the delay for two years?

22   A.     They're expensive.

23   Q.     Okay.  So did you have to fund the purchase of

24   Atlas?

25   A.     Yes, ma'am.

1    Q.    Why did you wait from 2015 until 2016, a year,

2    before you asked to bring Atlas to work with you?

3                    MS. BUTLER:  Objection.  Form.

4    A.    Because of training time.

5    Q.    (By Ms. Schoonmaker:)  Okay.  So let's go back

6    to when you got Atlas.  You got Atlas in 2014.  How

7    old was Atlas?

8    A.    Two months.

9    Q.    Okay.  And how long did Atlas remain in

10   training?

11   A.    About 18 months in total.

12   Q.    So was there a period of time that you had

13   Atlas, Atlas was trained and you were working at the

14   Union Pacific worksite before you asked to bring Atlas

15   to work?

16   A.    No, ma'am.

17   Q.    Not at all?

18   A.    No, ma'am.

19   Q.    So Atlas wasn't fully trained until April of

20   2016?

21   A.    That's correct.

22   Q.    Is it fair to say during that year that you

23   worked at Union Pacific between April or May of 2015

24   and April of 2016 when you asked to bring Atlas to

25   work, you were doing your job, right?

1   A.   Yes, ma'am.

2   Q.   And you were doing it safely, right?

3   A.   Yes, ma'am.

4   Q.   Just so I can be accurate, you returned from

5   your leave of absence in May of 2015 to work full time

6   at Union Pacific, correct?

7   A.   Correct.

8   Q.   And you asked that you be permitted to bring

9   Atlas to work on April 1st, 2016, according to what

10   you told the EEOC investigator, correct?

11   A.   Yes, ma'am.

12   Q.   So between May of 2015 and April of 2016, you

13   did your job and you did it safely, correct?

14   A.   Yes, ma'am.

15   Q.   Without Atlas, correct?

16   A.   Yes, ma'am.

17   Q.   It says that you called a third party company

18   and a report was done via telephone.  Do you know what

19   third party company that was?

20   A.   It was through Union Pacific.  I do not remember

21   the name.

22   Q.   Okay.

23   A.   Value.

24   Q.   Values Line?

25   A.   Yes, ma'am.

1    Q.    Okay.  And continuing on to UP Hopman 659, 9

2    says, "Please check all that apply."  Do you see that?

3    A.    Yes, ma'am.

4    Q.    And you checked, "Yes, I have a disability."  Is

5    that what you meant to say?

6    A.    Yes, ma'am.

7    Q.    And then question 10 says, "What is the

8    disability that you believe is the reason for the

9    adverse action taken against you?"  And you said, "Use

10   of service dog."  But what was the disability that you

11   believed was the reason for the adverse action taken

12   against you?

13   A.    I don't know.

14   Q.    What was -- what was the disability you claimed

15   you had back in April of 2016, Mr. Hopman?

16   A.    PTSD is one of them.

17   Q.    Okay.  Anything else?

18   A.    No, ma'am.

19   Q.    UP Hopman 660, the answer to number 16, you

20   wrote, "Service dog trainer Jordan Miller told me

21   denial was bogus and to come here."  Where could I

22   contact Jordan Miller?

23   A.    I have her phone number.

24   Q.    Okay.  Do you know who she works for?

25   A.    She works for herself.

1    Q.    Okay.  So was your idea then you'd bring Atlas

2    to work when he was in your possession in 2016, but

3    then not when he was off training?

4    A.    No, ma'am.  I was trying to be proactive for

5    when I did have Atlas with me as a completed 100

6    percent trained service animal, that it would be a

7    seamless transition into him coming to work with me.

8              So when I went in and filed this report,

9    the advisor -- the advisor.  One of the people there

10   in the EEOC office said that it would be best to wait

11   until I had Atlas with me full time before I filed an

12   official complaint.  So they recommended that I do the

13   withdrawal.

14   Q.    And you agreed to that?

15   A.    Yes, ma'am.

16   Q.    And you signed off and withdrew your charge,

17   right?

18   A.    Correct.

19   Q.    When you asked Josh Davis if you could bring

20   Atlas to work when you didn't have Atlas on a

21   full-time basis, what was your thinking of when Atlas

22   would come to work with you?

23   A.    I didn't have a date.  I was just being

24   proactive to get the okay to have a seamless

25   transition.

1    Q.    Okay.  So this was a request for sometime in the

2    future, correct?

3    A.    That's correct.

4    Q.    And when did that date in the future come?

5    A.    It was in 2017, I believe.

6    Q.    Okay.  Do you remember when you had Atlas full

7    time?

8    A.    No, ma'am.

9    Q.    Is there any way we could find that out?

10   A.    Yes, ma'am.

11   Q.    How would we find that out?

12   A.    I'm sure it's in here somewhere.

13   Q.    Okay.  And it may be.  I just may not be

14   remembering either.

15           MS. SCHOONMAKER:  Do you want to take a

16       short break?  We've been going about an

17       hour.

18           MS. BUTLER:  Sure.

19           (Recess from 9:57 a.m. to 10:07 a.m.)

20           (Exhibit 3 marked for identification.)

21   Q.    (By Ms. Schoonmaker:)  Mr. Hopman, I'd like you

22   to look at what the court reporter has marked as

23   Exhibit 3 to your deposition.  Union Pacific sent you

24   requests for admissions, which you answered.  And your

25   answers are contained in the three-page document that

1    is Exhibit 3.  Request Number 1 said, "Admit or deny

2    that before February of 2016, you never informed Union

3    Pacific's health and medical services that you had

4    been diagnosed with post traumatic stress disorder,"

5    and you denied that.

6              When did you inform Union Pacific's

7    health and medical services that you had been

8    diagnosed with PTSD?

9    A.    My fitness for duty.

10   Q.    And that's when you returned to duty in 2015?

11   A.    Yes, ma'am.

12   Q.    And Request Number 4, "Admit or deny that on or

13   about March of 2016, you did not request any

14   accommodation in order to perform your duties as a

15   trainman."  You said, "Admit."  Is that accurate?

16   A.    Yes.

17   Q.    And back in March of 2016, you were working as a

18   conductor, correct?

19   A.    Correct.

20   Q.    When did you stop working as a conductor?

21   A.    Technically, I haven't stopped.

22   Q.    Well, but have you been doing conductor duties

23   on a train while you're in training for the engineer

24   progression?

25   A.    No, ma'am.

1    correct?

2    A.    You'd be subject to call just like if you were

3    on the regular turn.

4    Q.    Okay.  And how would you be subject to call if

5    you were on the regular turn?

6    A.    Because every job that you're -- you don't have

7    a set schedule.  Even if you're on the regular turn,

8    you don't go to work at 8:00 every morning.  You go to

9    work when they call you.

10   Q.    Okay.

11   A.    And that can be anytime.

12   Q.    So you would not have a situation in which you

13   had a -- let's just say a job that was Monday through

14   Fridays with Saturday and Sunday as your rest days?

15   A.    No, ma'am.

16   Q.    Okay.  Are there any engineer jobs that you just

17   don't think you can do?

18   A.    No, ma'am.

19   Q.    Request Number 5 on the second page of

20   Exhibit 3, "Admit or deny that Union Pacific returned

21   you to work without any restrictions on or in April of

22   2010."  "Admit."

23              Were you off work before April of 2010?

24   A.    I don't remember.

25   Q.    Okay.  Well, you said you admitted that you were

Page 44

1    released to work without any restrictions on or in

2    April 2010 when you answered this.  Do you remember

3    any of the circumstances about your release to return

4    to work?

5              MS. BUTLER:  Linda, just for

6              clarification, I suspect that's a typo.  I

7              think it's April 2015.

8              MS. SCHOONMAKER:  That clarifies it to

9              me.  Okay.

10             MS. BUTLER:  I think that's a typo on

11             our part.

12             MS. SCHOONMAKER:  All right.

13   Q.   (By Ms. Schoonmaker:)  So with that

14   clarification, did Union Pacific release you to return

15   to work without any restrictions on or in April of

16   2015?

17   A.   Yes, ma'am.

18   Q.   Okay.  And that was on your return from military

19   service?

20   A.   Correct.

21   Q.   And that was as a result of your fitness for

22   duty exam that you underwent after your return?

23   A.   Yes.

24   Q.   Or in connection with your return?

25   A.   Yes, ma'am.

1    Q.    Okay.  Request Number 6, "Admit or deny that you

2    were able to perform the essential functions of your

3    job without the assistance of an emotional service dog

4    from May of 2015 through December of 2018."

5              "Admit in part and deny in part.  I was

6    able to and did perform essential functions of my job.

7    However, I deny that Atlas is an emotional service

8    dog.  He is a trained and certified service dog.  UP

9    would not and will not permit Atlas to be with me on

10   the job.  I also deny the request because I did suffer

11   flashbacks while at work and had to take breaks in

12   order to endure them."  When you were having these

13   flashbacks, were you a danger in the workplace?

14   A.    No, ma'am.

15   Q.    Okay.  I am going to skip a few sentences.

16   "Without Atlas, it is much harder to deal with my

17   condition on a day-to-day basis.  When I am triggered,

18   he intervenes to help.  This allows me to alleviate

19   the symptoms of my condition and to be able to work in

20   the same way as people who don't have PTSD."

21              Now, again, since Atlas has not been with

22   you on the train, is what you're saying that when

23   these episodes happen and the horrible pain that comes

24   with them, are you working unsafely?

25   A.    No, ma'am.

1   disability that you believe is the reason for the

2   adverse action taken against you?"  This time, you say

3   your disability is migraines, PTSD, anxiety, and

4   depression, correct?

5   A.    Yes, ma'am.

6   Q.    Okay.  And you also say you were taking

7   duloxetine.  What is that?

8   A.    Cymbalta.

9   Q.    Okay.  And Ambien?

10  A.    Yes, ma'am.

11  Q.    So you were still taking Ambien in 2017,

12  correct?

13  A.    Yes, ma'am.

14  Q.    Turning to UP Hopman 638, which is the sixth

15  page of Exhibit 4, this is an interview that was

16  conducted of you by Mr. Glover, the EEOC investigator,

17  correct?  A two-page document?

18  A.    Yes, ma'am.

19  Q.    The same investigator that interviewed you in

20  connection with your April 2016 charge, right?

21  A.    Correct.

22  Q.    I'm going to skip to the middle of the page,

23  because some of this is a little repetitive of what

24  was already in the other documents we looked at.  "On

25  May 6, 2017, Charging Party requested a reasonable

1   accommodation to be allowed to use his certified

2   service dog while on duty as a freight conductor.  CP

3   requested that his service dog accompany him when

4   walking train, ride within locomotive, in stay down

5   command, or could be tethered or crated while

6   switching and be allowed to travel to rest location.

7   Originally the request was denied on April 4, 2016.

8                    "CP submitted the request through Pauline

9   Weatherford, return to work manager.  After CP

10  submitted the paperwork to her, she sent it to Omaha.

11  The safety director and others looked at the request,

12  names unknown.  CP states that she helped him complete

13  the paperwork."

14                    Is that accurate:  Ms. Weatherford gave

15  you a hand with that?

16  A.    Yes, ma'am.

17  Q.    "On June 22nd, 2017, Union Pacific agreed to

18  allow CP to work in the yard without the dog.  If CP

19  accepted this position, his duties would have included

20  switching railcars and building trains and moving

21  cars.  This position is a yard job.  There are 25 yard

22  jobs that he could select from.  CP states his pay

23  would be half of what he is currently making.  CP

24  would receive around $50,000 per year in this

25  position.  Pauline verbally informed CP that his

1    accommodation request was denied."  Now, you turned

2    down the yard job, correct?

3    A.    No, ma'am.

4    Q.    Okay.  What's incorrect about that?

5    A.    I didn't turn it down.

6    Q.    Okay.  Did you want to pursue getting a yard

7    job?

8    A.    No, ma'am.

9    Q.    Okay.  Why not?

10   A.    Because at the time, the only jobs I knew about

11   in the yard paid a whole lot less than I was currently

12   making at the time.

13   Q.    Well, did you decline to consider a yard job at

14   that time?

15   A.    I don't recall doing that.

16   Q.    Okay.  All right.  So what happened to the

17   process of exploring potentially a yard job for you

18   back then; do you remember?

19   A.    There wasn't really a process in exploring it.

20   That's what they said I could do.

21   Q.    Did you pursue it?

22   A.    Yes, ma'am.

23   Q.    Okay.  And what happened as a result of your

24   pursuit?

25   A.    I got a yard job.

Page 52

1    Q.    Okay.  And did you work in the yard?

2    A.    Yes and no.

3    Q.    What does that mean?

4    A.    It was a board that I was unaware of called the

5    hybrid board.

6    Q.    Okay.

7    A.    And the hybrid board, generally, it's considered

8    a yard board, but it's technically not working in the

9    yard.

10   Q.    Okay.  So what job did you do on the hybrid

11   board?

12   A.    Conductor.

13   Q.    But it was a yard job?

14   A.    It's classified as a yard job, yes.

15   Q.    Okay.  Is that the job you continued to do until

16   you went to engineer training?

17   A.    The majority of the time, yes.

18   Q.    Okay.  In 2016, you made right around $88,000

19   and you weren't working this hybrid board yard job at

20   that time, right?

21   A.    Correct.

22   Q.    And in 2017, you made about $86,000, although

23   part of the year you were working this hybrid board

24   job; is that right?

25   A.    Yes, ma'am.

1    Q.    So were your concerns about only making $50,000

2    a year realized?

3    A.    No.

4    Q.    At the bottom of UP Hopman 638, on June --

5    "Around June 27, 2017, CP sent a response.  CP told

6    them that it felt like a punishment rather --" I think

7    maybe "and an accommodation.  CP said it would cause

8    additional stress that working on the road would not

9    and would increase the need for his service dog.  It

10   is a more dangerous environment."  Were you talking

11   about the yard job?

12   A.    Yes, ma'am.

13   Q.    And did it turn out to be something that caused

14   additional stress on you?

15   A.    Yes, ma'am.

16                MS. BUTLER:  Objection.  Form.

17   Q.    (By Ms. Schoonmaker:)  Okay.  And was it a

18   dangerous environment?

19   A.    Yes, ma'am.

20   Q.    But you continued working there, right?

21   A.    Yes, ma'am.

22   Q.    What was dangerous about it?

23   A.    It's just a dangerous job.

24   Q.    Well, how is it dangerous?

25   A.    Well, you're working with moving equipment.

1    You're working with other people in the yard that are

2    working with equipment via remote control.  I mean,

3    it's a dangerous environment.

4    Q.    Did you get hurt?

5    A.    No, ma'am.

6    Q.    Okay.  And you accepted working in that job,

7    right?

8    A.    Yes, ma'am.

9    Q.    And why would that yard job increase the need

10   you would have for Atlas?

11   A.    Because it's a more stressful job.

12   Q.    What hours were you working when you were

13   working in the yard?

14   A.    They weren't set hours.

15   Q.    Okay.  And did you get called in by crew

16   management to come work this job off a board?

17   A.    Yes, ma'am.

18   Q.    When you were working the yard job, did you ever

19   have to spend any time away from home?

20   A.    No, ma'am.

21   Q.    Was that different than before you were working

22   the yard job?  When you were on runs, did you have to

23   work away from home?

24   A.    Yes, ma'am.

25   Q.    Okay.  Back in 2017, you told the EEOC

Page 57

1     first request from April of 2016.  Midway through this

2     paragraph, "Complainant reported and continues to

3     report that he is capable of performing his duties

4     without the service animal."  Is that an accurate

5     statement?

6     A.    Yes, ma'am.

7     Q.    Okay.  "Complainant admits he is able to work

8     without the animal"; is that correct?

9     A.    Yes, ma'am.

10    Q.    Okay.  So we're going to skip through the

11    statements about Union Pacific Railroad Company.  And

12    at the bottom of the second page of the position

13    statement, which is UP Hopman 206, it starts "Factual

14    Background."  Do you see that?

15    A.    Yes, ma'am.

16    Q.    All right.  So turn to the next page, and I

17    believe that we can cut through the first couple of

18    sentences there.  "The conductor is responsible for

19    the train, the freight, and the crew."  Is that a true

20    statement?

21    A.    I'm trying to find that, but yes.

22    Q.    Okay.  Let's go down, it's five lines down after

23    "Division."  Do you see it?

24    A.    I'm with you.

25    Q.    Okay.  And you were a conductor back in 2017,

1     right?

2     A.     Yes, ma'am.

3     Q.     Still are today?  Haven't made it to engineer

4     yet, right?

5     A.     Correct.

6     Q.     Okay.  "Complainant's schedule is related to the

7     type of position he holds in the Collective Bargaining

8     Agreement," correct?

9     A.     Correct.

10    Q.     "Complainant has worked as a thru freight

11    conductor or road conductor," correct?

12    A.     Correct.

13    Q.     "This position requires the incumbent to work a

14    number of different schedules, including overnight

15    travel," correct?

16    A.     Correct.

17    Q.     "Employees working as road conductors are

18    selected from a pool of engineers and conductors,"

19    correct?

20    A.     Correct.

21    Q.     They do not work a fixed schedule, correct?

22    A.     Correct.

23    Q.     "It is dependent on business needs and hours of

24    service requirements," correct?

25    A.     Correct.

1    Q.    "The position is not structured.  An engineer

2    and conductor team switch out regularly," correct?

3    A.    Correct.

4    Q.    "Specifically, employees are called up from a

5    pool and could work with one engineer one night and

6    then not work with that same person for months,"

7    correct?

8    A.    It's possible.

9    Q.    "Therefore, a different team is created and a

10   regularly assigned team does not exist," correct?

11   A.    Correct.

12   Q.    "Scheduling is a complex process but ultimately

13   the employees are not assigned trains as a regular

14   team," correct?

15   A.    Correct.

16   Q.    "In contrast, Union Pacific has a position that

17   assigns employees to a yard job," correct?

18   A.    Correct.

19   Q.    "Employees who work yard jobs generally work a

20   fixed daily schedule at one location," correct?

21   A.    Correct.

22   Q.    "Within the Collective Bargaining Agreement,

23   employees may exercise seniority to obtain a different

24   position," correct?

25   A.    Correct.

1    Q.    I want to go over what the person writing the

2    position statement in response to your 2017 charge of

3    discrimination said about the job duties of the

4    conductor and I want to make sure that she got it

5    right, okay?

6    A.    Okay.

7    Q.    "A conductor is expected to perform the

8    following duties.  Accountabilities.  Responsible for

9    train operations and movement.  Includes operate

10   locomotive equipment, including through the use of a

11   remote control device and perform hostler operations

12   of operating locomotives between various job

13   locations, service tracks, and switching area."  Is

14   that a correct statement of one of the job duties of

15   the conductor?

16   A.    Yes.

17   Q.    Okay.  When you were working as a conductor,

18   were you able to perform those job duties?

19   A.    I didn't have to perform those job duties.

20   Q.    Why is that?

21   A.    Because those job duties weren't a part of the

22   yard board that I was assigned to.

23   Q.    What about when you were on a run, before you

24   were on the yard board?

25   A.    Yes, ma'am.

1    Q.    Okay.  And when you had those job duties, were

2    you able to perform them?

3    A.    Yes, ma'am.

4    Q.    Okay.  "Pushing, pulling, lifting, and carrying

5    up to 25 pounds frequently, 50 pounds occasionally,

6    and assisting in the infrequent movement of weights of

7    up to 83 pounds."

8              Is that an accurate statement of one of

9    the job duties of a conductor?

10   A.    Yes, ma'am.

11   Q.    Regardless of whether you were working on a run

12   or in a yard, were you able to perform those duties?

13   A.    Yes, ma'am.

14   Q.    And did you have those duties to perform?

15   A.    I don't know if I performed all of those three

16   duties.

17   Q.    Okay.  But you would have to push, pull, lift,

18   and carry up to 25 pounds frequently?

19   A.    Yes, ma'am.

20   Q.    You could do that without a problem in both the

21   yard and a run job?

22   A.    Yes, ma'am.

23   Q.    And you did those?

24   A.    Yes, ma'am.

25   Q.    Okay.  Did you have to occasionally do that with

Page 62

1    respect to 50 pounds?

2    A.    I can't say for certain.

3    Q.    Okay.  And I assume, then, you also can't say

4    for certain about 83 pounds, correct?

5    A.    No, ma'am.

6    Q.    Okay.  "Coupling air hoses."  Is that one of the

7    job duties of a conductor?

8    A.    Yes, ma'am.

9    Q.    Did you perform that job duty when you were

10   working on a run?

11   A.    Yes, ma'am.

12   Q.    Did you perform that job duty when you were

13   working on a -- at a yard job?

14   A.    Yes, ma'am.

15   Q.    Were you able to perform those job duties?

16   A.    Yes, ma'am.

17   Q.    That job duty.  Sorry.  "Uncoupling cars."  Is

18   that an accurate statement of one of the job duties of

19   a conductor?

20   A.    Yes, ma'am.

21   Q.    Did you actually uncouple cars?

22   A.    Yes, ma'am.

23   Q.    As both a yard worker and on a run?

24   A.    Yes, ma'am.

25   Q.    Okay.  So you were able to perform that job

Page 63

1    duty, correct?

2    A.    Yes, ma'am.

3    Q.    Okay.  "Applying and releasing handbrakes."  Is

4    that an accurate statement of a job duty of a

5    conductor?

6    A.    Yes, ma'am.

7    Q.    Were you able to perform that job duty?

8    A.    Yes, ma'am.

9    Q.    In both roles, yard and run?

10   A.    Yes, ma'am.

11   Q.    "Riding railcars and climbing onto equipment."

12   Is that an accurate statement of a job duty of a

13   conductor?

14   A.    Yes, ma'am.

15   Q.    Did you perform those job duties?

16   A.    Yes, ma'am.

17   Q.    Both in the yard and on a run?

18   A.    Yes, ma'am.

19   Q.    "Applying bilateral use of upper extremities

20   when needed such as maintaining a grip with both

21   hands."

22              Is that an accurate statement of a job

23   duty of a conductor?

24   A.    Yes, ma'am.

25   Q.    Did you perform that job duty?

Page 64

1    A.    Yes, ma'am.

2    Q.    And to make this go a little more quickly, I am

3    going to assume when you say "yes, ma'am," I am going

4    to assume you mean both yard and run.  Okay?

5    A.    Fair enough.

6    Q.    And if I have that wrong, you tell me if there's

7    a difference.  All right?

8    A.    Okay.

9    Q.    All right.  "Maintaining balance and

10   coordination on stairs, ladders, uneven terrain,

11   moving equipment, rails, and ballast."  Is that an

12   accurate statement of a job duty of a conductor?

13   A.    Yes.

14   Q.    Were you able to perform that job duty?

15   A.    Yes.

16   Q.    "Maintaining three-point contact when holding on

17   a ladder or train."  Is that an accurate statement of

18   a job duty of a conductor?

19   A.    Yes.

20   Q.    Were you able to perform that job duty?

21   A.    Yes.

22   Q.    "Removing, replacing, and carrying knuckles and

23   aligning drawbars."  Is that an accurate statement of

24   a job duty of a conductor?

25   A.    Yes, ma'am.

1    Q.    Were you able to perform that job duty?

2    A.    Parts of it.  Yes, ma'am.

3    Q.    Okay.  What parts could you not perform?

4    A.    Well, I didn't have the need to carry a knuckle.

5    Q.    Okay.  On either a run or a yard job, right?

6    A.    Correct.

7    Q.    Okay.  "Following safety precautions."  Is that

8    a job duty of a conductor?

9    A.    Yes, ma'am.

10   Q.    Were you able to perform that job duty?

11   A.    Yes, ma'am.

12   Q.    "Reading and comprehending regulations and

13   instruction."  Is that a job duty of a conductor?

14   A.    Yes, ma'am.

15   Q.    Were you able to perform that job duty?

16   A.    Yes, ma'am.

17   Q.    "Preparing written documentation and materials."

18   Was that a job duty of a conductor?

19   A.    Yes, ma'am.

20   Q.    Were you able to perform that job duty?

21   A.    Yes, ma'am.

22   Q.    "Working and interacting with others."  Is that

23   a job duty of a conductor?

24   A.    Yes, ma'am.

25   Q.    Were you able to perform that job duty?

1     A.     Yes, ma'am.

2     Q.     "Inspecting the conditions and operations of

3     equipment and machines and making adjustments."  May

4     require bending or stooping.  Is that a job duty of a

5     conductor?

6     A.     Yes, ma'am.

7     Q.     Were you able to perform that job duty?

8     A.     Yes, ma'am.

9     Q.     "Monitoring, observing, interpreting, and

10    relaying signals and placards to gather and

11    communicate information."  Is that a job duty of a

12    conductor?

13    A.     Yes, ma'am.

14    Q.     Were you able to perform that job duty?

15    A.     Yes, ma'am.

16    Q.     Turning to the next page of Exhibit 4, which is

17    marked UP Hopman 208.  "Analyzing and troubleshooting

18    problems to identify solutions or alternatives."  Is

19    that a job duty of a conductor?

20    A.     Yes, ma'am.

21    Q.     Were you able to perform that job duty?

22    A.     Yes, ma'am.

23    Q.     "Monitoring the situation, environment, engages

24    to gather information and take appropriate action.

25    Requires ability to recognize sounds and changes in

1    sounds and requires color vision, the ability to

2    detect and interpret visual stimuli day and night at

3    near and far distances, including hand signals,

4    printed material text, and the speed and distance of

5    moving objects."  Is that a job duty of a conductor?

6    A.    Yes, ma'am.

7    Q.    Were you able to perform those job duties?

8    A.    Yes, ma'am.

9    Q.    "Communicating clearly with coworkers and train

10   dispatchers via radio."  Is that a job duty of a

11   conductor?

12   A.    Yes, ma'am.

13   Q.    Were you able to perform those job duties?

14   A.    Yes, ma'am.

15   Q.    "Basic keyboarding."  Is that a job duty of a

16   conductor?

17   A.    Yes, ma'am.

18   Q.    Were you able to perform those job duties?

19   A.    Yes, ma'am.

20   Q.    Okay.  Who is Jay Everett?

21   A.    Jay Everett was the superintendent over the

22   North Little Rock service unit.

23   Q.    Was he your superintendent in 2017?

24   A.    Yes, ma'am.

25   Q.    Have you ever met Mr. Everett?

1    A.    No, ma'am.

2    Q.    Ever spoken to him?

3    A.    No, ma'am.

4    Q.    The second full paragraph, Page 4 UP Hopman 208

5    of Exhibit 4, "The role of a conductor includes work

6    outside of the locomotive while the engineer generally

7    remains inside the cab of the locomotive."  Is that a

8    true statement?

9             MS. BUTLER:  You misread it, but...

10            MS. SCHOONMAKER:  I'll do it again.

11        Sorry.

12   Q.    (By Ms. Schoonmaker:)  "The role of a conductor

13   involves work outside of the locomotive while the

14   engineer generally remains inside the cab of the

15   locomotive."  Is that a correct statement?

16   A.    Yes.

17   Q.    "It is not uncommon for the conductor to walk

18   the train which, on average, is 7,000 feet long."  Is

19   that a true statement?

20   A.    I don't know what the average is.

21   Q.    Okay.  "It is not uncommon for the conductor to

22   walk the train."  Is that a true statement?

23   A.    Yes.

24   Q.    "The conductor is expected to walk the length of

25   the train and back."  Is that a true statement?

1    hose.

2    Q.    Okay.  Anything else untrue about that

3    statement?

4    A.    No, ma'am.

5    Q.    It says, "Union Pacific is a 24/7 operation.

6    The conductor may walk the train performing an

7    inspection with only the light from a flashlight."  Is

8    that a true statement?

9    A.    Yes, ma'am.

10   Q.    "Union Pacific trains operate in remote areas

11   where the only light source is the locomotive

12   headlights."  Is that a true statement?

13   A.    No, ma'am.

14   Q.    What's untrue?

15   A.    I've got the flashlight.

16   Q.    Okay.  Is there any other light source besides

17   the locomotive headlights and the flashlight while you

18   are operating in a remote area?

19   A.    Sometimes the occasional street light.

20   Q.    All right.  "All of the duties may be performed

21   in extreme weather conditions, such as rain, snow, and

22   heat."  Is that a true statement?

23   A.    Yes, ma'am.

24   Q.    The work is unpredictable, dangerous, and

25   constantly changes.  Is that a true statement?

Page 72

1    A.    At times, yes.

2    Q.    "The engineer and conductor communicate via

3    radio during the activity."  Is that a true statement?

4                MS. BUTLER:  Object to the form.

5                MS. SCHOONMAKER:  Did I read it wrong

6           again?

7                MS. BUTLER:  No.

8                MS. SCHOONMAKER:  Okay.  Thank you.

9    A.    Sometimes.

10   Q.    (By Ms. Schoonmaker:)  Okay.  All right.  The

11   accommodation request.  Turning to complainant EEO

12   charge affidavit, it indicates, "Complainant had a

13   disability as early as 2008.  However, complainant

14   never informed UP that he was disabled and he did not

15   seek an accommodation until April of 2016."  Is that a

16   true statement?

17   A.    Yes.

18   Q.    About the middle of this page UP Hopman 209,

19   there is A, B, and C.  Do you see that?

20   A.    Yes, ma'am.

21   Q.    Okay.  The paragraph that starts after that,

22   "Complainant was on military leave from approximately

23   April 11, 2010, until May 4th of 2015."  Is that a

24   true statement?

25   A.    Yes, ma'am.

1    Q.    (By Ms. Schoonmaker:)  You worked with Pauline

2    Weatherford in connection with your request to bring

3    Atlas to the workplace.  Do you have any complaints --

4    other than the outcome, do you have any complaints

5    about the way Ms. Weatherford treated you?

6    A.    No, ma'am.

7    Q.    Was she responsive to you?

8    A.    Yes, ma'am.

9    Q.    Concerned?  Compassionate?

10   A.    Seemed so.

11   Q.    Was there anybody in this process relating to

12   your request to bring Atlas to work who did not treat

13   you -- again, regardless -- putting aside the outcome,

14   who did not treat you appropriately, professionally,

15   with compassion?

16                  MS. BUTLER:  Objection.  Form.

17                  MS. SCHOONMAKER:  Okay.

18   A.    She's the only person I talked to.

19   Q.    (By Ms. Schoonmaker:)  Okay.  And no complaints

20   about her?

21   A.    No, ma'am.

22   Q.    All right.  Ms. Weatherford talked to you about

23   the option of using Family and Medical Leave Act

24   leave, but you rejected that option; is that correct?

25   A.    No, ma'am.

```
 1    A.    At times, maybe.

 2    Q.    Okay.  So -- but you maintain that despite the

 3    fact you had these issues, you always were able to

 4    work safely, right?

 5    A.    Correct.

 6    Q.    Or you wouldn't have come and gotten on a train,

 7    right?

 8    A.    Correct.

 9    Q.    Okay.  This is completed by Lesa Lackey Doan.

10    Is she a doctor?

11    A.    No, ma'am.

12    Q.    Okay.  Is she a social worker?

13    A.    I think that's her title.

14    Q.    Was she your therapist?

15    A.    Yes, ma'am.

16    Q.    Okay.  When did you start seeing Ms. Doan, if

17    you recall?  Any recollection?

18    A.    It would be a complete guess.

19    Q.    Okay.  Well, we'll look at other documents maybe

20    that will help you.  When did you last see Ms. Doan?

21    A.    I don't know that either.

22    Q.    Did you see her in 2019?

23    A.    No, ma'am.

24    Q.    Did you see her in 2018?

25    A.    I don't remember.
```

1    Q.    (By Ms. Schoonmaker:)   Okay.   Would Atlas need

2    to be retrained at some point in time?

3    A.    Ongoing training.   Yes, ma'am.

4    Q.    How frequently?

5    A.    Well, recently, quite a bit.

6    Q.    And why is that?

7    A.    Because I'm not getting to spend the time with

8    him because of the work schedule.

9    Q.    So how is that training done?

10   A.    The training is done with his trainer.

11   Q.    Okay.   And does Atlas go away for that training?

12   A.    Yes, ma'am.

13   Q.    For what period of time?

14   A.    It depends on what they're working on.

15   Q.    Okay.   So when is the last time Atlas went away

16   for training?

17   A.    Two weeks ago.

18   Q.    And how long was Atlas gone?

19   A.    Got him back yesterday.

20   Q.    Okay.   So Atlas was gone almost two weeks?

21   A.    Yes, ma'am.

22   Q.    And before that, when was the last time he had

23   had more training?

24   A.    I don't remember the dates.

25   Q.    Well, in 2019 or 2018?

1    Q.    And where are they located?

2    A.    Sheridan.

3    Q.    Arkansas?

4    A.    Yes, ma'am.

5    Q.    So you participated in the training program; is

6    that correct?

7    A.    Yes, ma'am.

8    Q.    Okay.  So from what you saw, what was Atlas

9    trained to do to assist you with your disability?

10   A.    Several tasks.

11   Q.    Okay.  Tell me the tasks.

12   A.    Grounding.

13   Q.    What is grounding?

14   A.    Grounding is when he senses my anxiety levels

15   elevating, he comes up and puts pressure on a part of

16   my body.  And it's called grounding.

17   Q.    What else was he trained to do?

18   A.    Medication reminders for the same time of day,

19   regardless if I'm sleeping or not.

20   Q.    So he would wake you up to take your medication?

21   A.    Yes, ma'am.

22   Q.    Okay.  What else?

23   A.    It's called a hover.  And in a crowd of people,

24   he'll go out approximately three to five feet from me

25   and walk in circles around me to keep the crowd at

1    bay.

2    Q.    What else?

3    A.    He let's me know when I have a migraine coming.

4    Q.    What else?

5    A.    He does what they call a blocking technique,

6    where he'll position himself in a way that doesn't

7    allow people to come up from the back.   And if someone

8    is approaching, he'll let me know.

9    Q.    What else?

10   A.    He can find the closest exit in a building if I

11   need to get out.

12   Q.    What else?

13   A.    He can pick up dropped items.

14   Q.    What else?

15   A.    Retrieve items.

16   Q.    What?

17   A.    Retrieve items.

18   Q.    Okay.   What else?

19   A.    Wakes me up from nightmares.

20   Q.    What else?

21   A.    Basically forces me to go out and do things,

22   gets me out of the house.

23   Q.    What else?

24   A.    That's all I can think of right now.

25   Q.    Okay.   Would you say that he was -- like, his

1    Whom it May Concern" letter from Jordan Miller, and

2    it's not clear to me.  It's dated April 10, 2017.  And

3    it says, "This letter is to verify that you and your

4    dog have completed and fulfilled all of the necessary

5    requirements for the program."  Does that mean that's

6    when it happened, or had it happened before that time?

7    A.    It happened before that time.

8    Q.    Do you know when it was?

9    A.    I don't remember.

10   Q.    Okay.  So turning two more pages to the Form B

11   Reasonable Accommodation Request Intake Form.  There

12   you go.  UP Hopman 193 and 194, this was dated 5-9-17.

13   And you are, again, requesting to bring Atlas to the

14   workplace; is that correct?

15   A.    Yes, ma'am.

16   Q.    Okay.  Now, when we turn to the third page of

17   this document, which is UP 195, it says, "Functional

18   limitations interfering with job performance,

19   benefits, or application processes."  It appears you

20   checked "Interacting with others"?

21   A.    Yes, ma'am.

22   Q.    Okay.  Well, describe to me how that interferes

23   with your job performance, benefits, or application

24   processes?

25   A.    Due to increased anxiety and irritation.

1   Q.    Okay.  So how did it interfere then?

2   A.    It interferes because it just kind of makes you

3   feel -- not sick, but you might -- it might make the

4   onset of a headache or it might make you have an upset

5   stomach or it might make you need to drink a lot of

6   water.

7   Q.    But you were still able to do your job?

8   A.    Yes, ma'am.

9   Q.    Okay.  "Difficulties with autonomic regulation,

10  like blood pressure."  Describe that functional

11  limitation to me.

12  A.    I'm not real certain why that's on there.  With

13  the blood pressure, I mean, he helps me with anxiety.

14  And I don't know why it says and panic when walking

15  the train.

16  Q.    Okay.  It says in Number 7 that you are

17  currently, at that time, able to function but

18  experiencing increased anxiety, fatigue, and

19  difficulties concentrating when service dog is not

20  present performing trained tasks.  Now, while you were

21  employed at Union Pacific, has Atlas ever been present

22  when you've been working?

23  A.    No, ma'am.

24  Q.    "Fearful will lead to inability to perform

25  essential functions without the accommodation."  Did

1    you ever reach a point at which you were unable to

2    perform the essential functions of your job?

3    A.    No, ma'am.

4    Q.    Okay.  And turning to the next page of Form C,

5    "Resolution," this is UP Hopman 201, 202.  Now, this

6    document says that your accommodation was approved but

7    different from the original request.  Okay.

8              And it says in 3(b), "Effective use of

9    seniority to move into a yard position that would

10   eliminate the need for overnight stays which impacted

11   his condition without the accompaniment of his service

12   dog.  However, employee felt this would be a financial

13   disadvantage."

14             Now, you actually did go to a yard

15   position, right?  That's what you told me earlier.

16   A.    A yard board.  Yes, ma'am.

17   Q.    A yard board.  Okay.  This also says that you

18   were going to apply for FMLA if and when the potential

19   for impact of condition on ability to perform

20   essential functions needs to be remediated for time

21   off from work.  And you never did that, right?

22   A.    I did get FMLA.

23   Q.    For one time?

24   A.    I used it once.

25   Q.    Right.  Okay.  I'm sorry.  I misunderstood.  I

1    A.    Yes, ma'am.

2    Q.    And how frequently do you think you'd need to be

3    off?

4    A.    It varies.  I can't put a number on it.

5    Q.    Well, do you think you would need to be off

6    every week?

7    A.    Possibly.

8              MS. BUTLER:  Objection.  Form.

9              (Exhibit 9 marked for identification.)

10   Q.    (By Ms. Schoonmaker:)  Mr. Hopman, I'd like you

11   to look at what the court reporter has marked as

12   Exhibit 9 to your deposition, which is plaintiff's

13   first amended complaint.  Have you seen this document

14   before?

15   A.    I think so.

16   Q.    Turning to the second page of Exhibit 9,

17   Paragraph 7, it says, "The plaintiff was discriminated

18   against because of his disability, post traumatic

19   stress disorder.  Union Pacific also breached its duty

20   of accommodation."  Am I correct in understanding that

21   your only claimed disability therefore is PTSD?

22             MS. BUTLER:  Objection.  Form.

23   A.    According to this, yes, ma'am.

24   Q.    (By Ms. Schoonmaker:)  Well, is this false?

25   A.    No, ma'am.

1    Q.    Okay.  So it's true?

2    A.    Yes, ma'am.

3    Q.    All right.  Turning to the third page of Exhibit

4    9, Paragraph 12 says, "On multiple occasions, Mr.

5    Hopman has requested an accommodation from Union

6    Pacific that would help him mitigate the anxiety,

7    flashbacks, and panic attacks he suffers as a result

8    of PTSD so that he may have equal benefits and

9    privileges of employment as are enjoyed by his

10   coworkers without disabilities."

11              Now, I believe that you have actually

12   requested the accommodation on two occasions; is that

13   right?  Back in 2016 and then again in 2017?

14   A.    Yes, ma'am.

15   Q.    So those are the multiple occasions; is that

16   right?

17   A.    Correct.

18   Q.    And back in '16, I think you told me you didn't

19   have Atlas yet fully trained; is that correct?

20   A.    That's correct.

21   Q.    Okay.  So the only time that you were denied an

22   accommodation when you had Atlas fully trained is in

23   2017; is that correct?

24   A.    Correct.

25   Q.    Okay.  "His job as a conductor was aboard trains

Page 122

1   from Little Rock to Monroe, Louisiana, and back"; is

2   that correct?

3   A.    Yes, ma'am.

4   Q.    Number 13, "At all times, Union Pacific denied

5   all of Mr. Hopman's suggestions that would have

6   assisted him continuing on his route, and it made no

7   suggestion at all that would have prevented him from

8   moving to the yard and reducing his pay."

9             14, "Due to Union Pacific's refusal to

10  accommodate Mr. Hopman so that he could continue his

11  regular job, he took a lower paying position in the

12  yard."

13            Now, you actually did not take a lower

14  paying position in the yard, correct?

15  A.    Correct.

16  Q.    Okay.  So that statement in Number 14 is untrue?

17  A.    Correct.

18  Q.    Number 15, "Union Pacific has not had any in

19  person meetings with Mr. Hopman regarding his request

20  for accommodation and have never asked for any

21  information on PTSD or service dogs that would have

22  allowed it to have good faith interactive discussion

23  of ways to mitigate the effects of PTSD in connection

24  with his route."

25            Now, what was it that you wanted Union

Page 124

1    Q.    Now, you interacted with Ms. Weatherford,

2    correct?

3    A.    She's not the decisionmaker.

4    Q.    Right.  But you interacted with her and provided

5    her with information, right?

6    A.    Yes, ma'am.

7    Q.    So turning to Page 5, of Exhibit 9, there is a

8    prayer for relief.  "Wherefore, Mr. Hopman demands,

9    one, judgment against defendant in an amount to make

10   him whole for damages suffered by him as a result of

11   defendant's violation of the Rehabilitation Act and

12   the ADAAA, including but not limited to damages for

13   back pay and benefits."

14             What back pay are you claiming you've

15   lost?

16   A.    Different boards have different guarantees and

17   pay amounts.  With the freedom to go wherever I

18   wanted, I could have chose to go the south end, which

19   is the highest paying board that we have.

20   Q.    Well, how would you quantify how much money you

21   claim you lost because you couldn't take Atlas with

22   you to work?

23   A.    I can't put a monetary amount on it.

24   Q.    So since you're suing Union Pacific for that,

25   how are we going to find out the answer?

Page 132

1    Q.    Okay.  In the workplace where you train, has
2    Atlas been there?
3    A.    No, ma'am.
4    Q.    Okay.  Does Atlas go and stay at the hotel with
5    you?  Is that why you are hesitating?
6    A.    No.  I had permission to take him to Salt Lake
7    for that portion of the training, but he injured
8    himself a couple of days prior.  So I didn't take him,
9    but I had the blessing to take him.
10   Q.    Okay.  To take him where?
11   A.    To Salt Lake City for training.
12   Q.    Right.  But where would Atlas be while you were
13   training?
14   A.    With me.
15   Q.    And what part of the training was this?
16   A.    This was the phase two -- no.  I'm sorry.  Phase
17   three.
18   Q.    Was that classroom training?
19   A.    Yes, ma'am.
20   Q.    Was any of that training on the train?
21   A.    No, ma'am.
22   Q.    And who gave you the blessing?
23   A.    Somebody at the school house.
24   Q.    And what do you mean the school house?  Where
25   the training was conducted?

1    A.    Yes, ma'am.

2    Q.    But you don't remember the name of the person?

3    A.    No, ma'am.  I did it through Pauline.

4    Q.    Okay.  And she arranged it?

5    A.    She found out if it would be a problem or not.

6    Q.    And was it a problem?

7    A.    No, ma'am.

8    Q.    But Atlas was recovering from surgery?

9    A.    He -- he had surgery scheduled the day I was

10   leaving for Salt Lake.

11   Q.    Okay.  So he was not able to attend because of

12   his surgery?

13   A.    Correct.

14             (Exhibit 10 marked for identification.)

15   Q.    I'd like you to look at what the court reporter

16   has marked as Exhibit 10 to your deposition, which is

17   a document consisting of UP Hopman 330 through 336.

18   Have you ever seen this document before?

19   A.    Yes, ma'am.

20   Q.    What is this document?

21   A.    This is a document from an expert for Union

22   Pacific.

23   Q.    Let's turn to Page 6 of Exhibit 10.  First full

24   paragraph, "Complainant would be required to conduct

25   an air brake inspection of a cut of rail cars that his

1    A.    Almost the entire statement.

2    Q.    Okay.  Is there anything in it that is true?

3    A.    No, ma'am.

4    Q.    Okay.  "Complainant would be focused on keeping

5    Atlas safe from hazards and not focused on the task at

6    hand, the brake inspection, and his own personal

7    safety."  True statement?

8    A.    No, ma'am.

9    Q.    What's untrue about it?

10   A.    The entire statement.

11   Q.    Okay.  So you would be focusing not on keeping

12   Atlas safe?

13   A.    Correct.

14   Q.    Okay.  How would you be able to do that?

15   A.    Atlas watches me.  I don't watch Atlas.

16   Q.    Okay.  You have no emotional bond with your dog?

17   A.    Not particularly, no.

18   Q.    Was Atlas trained in the railroad environment

19   complete with all the smells, noises, and safety

20   hazards a service dog would encounter while assisting

21   the complainant to cope with his illness?

22   A.    No, ma'am.

23              MS. SCHOONMAKER:  I have to look at

24         something.  Can we take a short break?

25         We're almost finished.

Page 136

1          MS. BUTLER:  Sure.

2          (Recess from 2:02 p.m. to 2:08 p.m.)

3    Q.    (By Ms. Schoonmaker:)  Mr. Hopman, what physical

4    or mental limitations do you have that restrict you

5    from performing the essential functions of your job?

6    A.    None.

7    Q.    And is that also true for the new job you're

8    training for, an engineer job?

9    A.    Yes, ma'am.

10   Q.    Okay.  So is it fair to say that your claimed

11   disability here is post traumatic stress disorder?

12   A.    Yes.

13   Q.    And is it also fair to say that despite your

14   PTSD, you can still perform the essential functions of

15   your current job as a conductor and your future job as

16   an engineer?

17   A.    Yes, ma'am.

18   Q.    Okay.  Does the PTSD impair you in any other

19   major life activities outside of working?

20   A.    I'm not sure what you're asking.

21   Q.    Okay.  Well, does the PTSD impair your ability

22   to do any other major life functions or major life

23   activities, other than working?

24   A.    Yes, ma'am.

25          MS. BUTLER:  I am going to object.

Page 145

1                    REPORTER CERTIFICATION

2       STATE OF ARKANSAS       )

3       COUNTY OF PULASKI       )

4            I, TAMMIE L. FOREMAN, Certified Court Reporter
        in and for the aforesaid county and state, do hereby
5       certify to the following:

6            1)   The foregoing deposition was taken before
        me at the time and place stated in the foregoing
7       styled cause with the appearances as noted;

8            2)   Being a Court Reporter, I then reported
        the deposition in Stenotype to the best of my skill
9       and ability, and the foregoing pages contain a full,
        true and correct transcript of my said Stenotype notes
10      then and there taken;

11           3)   I am not in the employ of and am not
        related to any of the parties or their counsel, and I
12      have no interest in the matter involved;

13           4)   Signature of the witness is waived.

14           IN WITNESS WHEREOF, I have hereunto set my
        hand and affixed my seal of office this 15th of
15      April, 2019.

16

17                        _____
                          TAMMIE L. FOREMAN, CCR, RPR, CRR
18                        LS Certificate #305, State of Arkansas
                          Arkansas Realtime Reporting
19                        701 West 7th Street
                          Little Rock, Arkansas
20                        501-725-7963
                          www.ArkansasRealtimeReporting.com
21                        Tammie@ArkansasRealtimeReporting.com

22

23

24

25