# EXHIBIT H

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS


PERRY HOPMAN                    *
                 PLAINTIFF      *
                                *
VS.                             * CIVIL ACTION NO.
                                *  4:18-cv-74-KGB
                                *
UNION PACIFIC RAILROAD          *
                 DEFENDANT      *


*******************************************************
ORAL AND VIDEOTAPED DEPOSITION OF
PAULINE WEATHERFORD
FEBRUARY 11, 2019
VOLUME 1 OF 1
***************************************************


ORAL AND VIDEOTAPED DEPOSITION OF

PAULINE WEATHERFORD, produced as a witness at the

instance of the Plaintiff, and duly sworn, was taken

in the above-styled and numbered cause on the 11th day

of February, 2019, from 3:31 p.m. to 6:55 p.m., before

Linda G. Boyko, CSR in and for the State of Texas,

reported by stenographic means, at the law offices of

Butler & Harris, 1007 Heights Boulevard, Houston,

Texas, pursuant to Rule 30 of the Federal Rules of

Civil Procedure.

PAPULINE WEATHERFORD          VOLUME 1          FEBRUARY 11, 2019

                                                        Page 2

 1                    A P P E A R A N C E S

 2

 3          COUNSEL FOR PLAINTIFF:

 4               Ms. Katherine L. Butler
                 Butler & Harris
 5               1007 Heights Boulevard
                 Houston, Texas  77008
 6               Phone: (713) 526-5677
                 E-mail: kathy@butlerharris.com
 7

 8

 9          COUNSEL FOR DEFENDANT:

10               Mr. Torry N. Garland
                 Union Pacific Railroad
11               1400 Douglas Street, Stop 1580
                 Omaha, Nebraska 68179-1580
12               Phone: 402.544.3135
                 E-mail: tngarlan@up.com
13

14

15          ALSO PRESENT:

16               Mr. Jon Castro, Videographer

17

18

19

20

21

22

23

24

25

LINDA G. BOYKO, CSR                          713.521.1117

PAPULINE WEATHERFORD          VOLUME 1          FEBRUARY 11, 2019

```
                                                Page 3
 1                      I N D E X
                     DEPOSITION OF
 2                   PAULINE WEATHERFORD

 3                                              PAGE

 4     Appearances                                2

 5     Stipulations                               5

 6
       Examination By
 7
       Ms. Butler                                 5
 8

 9     Changes and Signature Pages              141

10     Reporter's Certificate Pages            143

11

12                    EXHIBIT INDEX

13     NO.                                      PAGE

14     11          Amended Notice of Deposition
                   and attached Rule 30(b)(6)
15                 deposition topics              5

16     12          Reasonable Accomodation Policy  20

17     13          Values Line General
                   Information Report             44
18
       14          Form C - Part II - Resolution
19                 of Reasonable Accomodation
                   Request-Denial                45
20
       15          Hopman Service Dog Request
21                 Synopsis                      60

22     16          E-mail from Ms. Weatherford to
                   Mr. Hopman (4-19-16)          62
23
       17          E-mail from Ms. Weatherford to
24                 Mr. Hopman (4-19-16)          64

25     18          Medical Comments History     46
```

Page 8

1    and just ask for the same commitment from you.

2    A    Yes.

3    Q    Okay, great.  Now, let me ask you this.  How long

4    have you worked for Union Pacific?

5    A    Five years this December.

6    Q    Five years this December.  And always in Houston?

7    A    I cover the southern region.  My office is in

8    Houston.

9    Q    And have you had the same job the whole time?

10   A    Within UP?

11   Q    Yes.

12   A    Yes.

13   Q    And tell me about that job.

14   A    I'm a senior vocational case manager.  I provide

15   services to our employees.  I manage their unpaid

16   medical leave for the on-duty injuries, and then I

17   manage the vocational rehab program, and the

18   accomodation requests for employees within our

19   territory.

20   Q    So the reason you got involved in this is because

21   Mr. Hopman asked for an accommodation, correct?

22   A    Correct.

23   Q    So when you're considering an accommodation

24   request, what is your role in the process?  Are you

25   the decider?  I mean do you figure out whether to

PAPULINE WEATHERFORD        VOLUME 1        FEBRUARY 11, 2019

                                                          Page 9

 1   grant the accomodation or not?

 2   A   No.  I do not make that decision.

 3   Q   And is that true, you did not do that in Mr.

 4   Hopman's case?

 5   A   That is correct.

 6   Q   So what is your role then?

 7   A   My role is to explain the process to the employee,

 8   go through the interactive process, clarify what

 9   they're wanting, and help them through that process of

10   getting what they're requesting, if possible.

11   Q   And in Mr. Hopman's case, did you explain the

12   process to him?

13   A   Yes.

14   Q   Both times?

15   A   Yes.

16   Q   And do you believe that you engaged effectively in

17   the interactive process both times?

18   A   Yes.

19   Q   And what is your understanding of the obligations

20   of an employer with regard to the interactive process?

21   A   They're required to go through the interactive

22   process with the employee and make sure that we

23   fulfill that commitment so that we can have a dialogue

24   about what it is the employee is needing and seeking.

25   Q   But what is your understanding of specifically --

PAPULINE WEATHERFORD          VOLUME 1          FEBRUARY 11, 2019

Page 13

1    A    Gniffke-Pribyl.

2    Q    And then the second time, it was a different

3    person?

4    A    Well, Miss Sheila was no longer with the company,

5    I think, for the second one, when it escalated.

6    Q    Who was the person at that time?

7    A    We don't have -- it would have gone to Peggy

8    Grosskopf I think.

9    Q    And what is her role?

10   A    She was the director over clinical services.

11   Q    Okay.  I'm just a little confused.  It starts with

12   you, and then it goes to Mr. Everett, and then --

13   A    For approval.

14   Q    -- for approval?

15   A    Uh-huh.

16   Q    Do you weigh in one way or the other, about

17   whether it should be approved?

18   A    I will address, if I get feedback that seems that

19   it's not in line with what I think it should be, yes,

20   I'll speak with the superintendent and then advocate

21   for the employee I'm working with.

22   Q    And then if it goes up to, if the employee

23   disagrees with the assessment, then with regard to the

24   2016 request, it went up to Sheila --

25   A    Gniffke-Pribyl.

Page 14

```
 1   Q   -- Gniffke-Pribyl.

 2   A   And the EEOC as well.

 3   Q   Okay.  They're different -- what is --

 4   A   Sheila was the director over DP&M at that time.

 5   Q   What is DP&M?

 6   A   Disability prevention and management.

 7   Q   Disability prevention and management.

 8               And who at the EEOC -- you're talking

 9   about internal at the EEOC?

10   A   Yes.

11   Q   Who was involved in it in 2016?

12   A   I cannot remember the name.

13   Q   And are there any documents that would show all of

14   the people who were involved and what they did for

15   each step?

16   A   A written out document?

17   Q   Yes.

18   A   Not that I'm aware of.

19   Q   So I mean it just seems to me you're having

20   trouble remembering the people, but as I understand

21   it, Union Pacific doesn't have any protocol that they

22   have to keep records of who, you know, who considered

23   it, then what was said, and then it went to this

24   person?

25   A   Yes.  There's records.  I don't have a sheet
```

Page 18

1    Prevention and Management, correct?

2    A    That's correct.

3    Q    Then it also goes to the EEOC?

4    A    Yes.

5    Q    And is there a particular person there?

6    A    It would have gone to Jay -- I can't remember.

7    He's got a very long last name.  He was over the EEOC.

8    Q    And so then what happens next?  So you've got

9    these two entities.  Do they jointly make a decision

10   or what happens next?

11   A    Generally what happens is they would pull in --

12   they review what it is that he was objecting to, and

13   they usually will go through the same process again

14   and look at what his objectives were and concerns.

15   And then they'll consult with other people in the

16   company regarding the questions and whether a

17   different decision could be made or if there's any

18   changes.

19   Q    And in 2016, who else was consulted at this level

20   besides the EEOC, Jay, whatever, and Sheila

21   Gniffke-Pribyl?

22   A    I don't remember all the people that were involved

23   in the decision in 2016.

24   Q    And would that be in your notes?

25   A    It could be.

PAPULINE WEATHERFORD          VOLUME 1          FEBRUARY 11, 2019

Page 21

1   A   I have never had a problem dealing with Mr.
2   Hopman.
3   Q   In 2017, who was involved?  You -- you wrote it up
4   and did you make an initial decision?  I mean --
5   A   I don't make a decision in these cases.
6   Q   Did you recommend to Mr. Everett, in either 2016
7   or 2017, you should deny this?
8   A   I don't make recommendations.
9   Q   But you said that sometimes you have a strong
10  feeling and you do say something?
11  A   I will advocate for the employees when, depending
12  on, you know, what the circumstances are and what the
13  accomodation is and what the reasoning is behind a
14  denial.  If there's something I can argue with them
15  about, I certainly do.
16  Q   Did you advocate for Mr. Hopman?
17  A   I did.
18  Q   Okay.  Tell me about that.
19  A   When reviewing some of the initial accomodation
20  requests, some of the concerns with a new accomodation
21  comes from -- I explained to the command what a
22  service animal does, how well they're trained, what
23  they do, what their purpose is.  Because I think
24  initially there were concerns about like hygiene and
25  where would the dog defecate.  And those were some of

LINDA G. BOYKO, CSR                            713.521.1117

PAPULINE WEATHERFORD          VOLUME 1          FEBRUARY 11, 2019

Page 22

1   the safety concerns they had had initially.  So I

2   basically explained to him how the service animals are

3   trained and what the work is that they do and their

4   purpose is so that he would have a better

5   understanding of -- that that particular concern, most

6   likely, would not be an issue.

7   Q   In 2017, when you got Mr. Hopman's request, it

8   went again to Mr. Everett?

9   A   Yes.

10  Q   And he made the initial decision, the same

11  decision he had made before, correct?

12  A   Yes.  He did.

13  Q   And then it went to Peggy Grosskopf?

14  A   I believe Peggy was -- would have been my director

15  at the time, which is who I would escalate it up to

16  when it's turned down.

17  Q   So did you send it to your boss the first time?

18  A   For --

19  Q   2016.  Did you send it --

20  A   For it to escalate?

21  Q   Yes.

22  A   Yes.

23  Q   So in each case, it went to Peggy before going to

24  the EEOC and to --

25  A   No.  At the same time.  They get referred to the

PAPULINE WEATHERFORD          VOLUME 1          FEBRUARY 11, 2019

Page 24

 1   properly --

 2               MR. GARLAND:  They would be.  And if we

 3   have them, we would have disclosed them.  If we don't

 4   have them, I did tell Mr. Griffin that we're having

 5   another e-mail run to go through and Lena Waterkotte

 6   is in the process of doing another e-mail run with an

 7   expanded list of custodians because I wasn't sure that

 8   we would have gotten everything.  So you'll have

 9   another dump I'm assuming.  If there's documents that

10   we didn't give you on our first run, we'll give them

11   to you then.  I'll make that commitment.

12               MS. BUTLER:  Right.  And you understand

13   if there's new documentation --

14               MR. GARLAND:  You can --

15               MS. BUTLER:  -- I might need to talk to

16   her --

17               MR. GARLAND:  Yes.  And that is well

18   within your rights.

19               MS. BUTLER:  Great, great, great.

20   Q   (By Ms. Butler)  So then your boss and the EEOC

21   person, they come to the same conclusion, right?

22   A   Yes.

23   Q   It should be denied.  And do they document that or

24   do you know?

25   A   It's documented on the Accomodation Request Forms,

LINDA G. BOYKO, CSR                        713.521.1117

Page 25

1   is generally where they document the reasoning for the

2   denial.

3   Q   Okay.  We'll get to that in a second.

4              And then were they the final say?  I

5   mean Torry mentioned that it had gone up to Mr. Doerr.

6   So how does that work?

7   A   Generally, in my working knowledge, the

8   superintendent is the person that makes that final

9   decision.  I would imagine that the input from Mr.

10  Doerr and whether they felt it's something that they

11  could accomodate is part of his decision-making

12  process.

13  Q   So Mr. Doerr may have had a role, but you didn't

14  know about it at the time.  It was your belief that

15  the superintendent was --

16  A   Yes.

17  Q   -- the person who made the decision?

18  A   Yes.  The person that I --

19  Q   Yes.  And I would need to talk to Mr. Everett to

20  learn more?

21  A   Yes, uh-huh.

22  Q   Great.

23              MR. GARLAND:  Remember to, when you say

24  uh-huh, she, the court reporter can't take it down.  I

25  know, it's just a habit, we all have it.

Page 28

1  Page 1, why an applicant -- or I mean an employee's

2  request for accomodation should be granted, right?

3  A   Yes.

4  Q   And one of them is, "When an employee with a

5  disability needs a reasonable accomodation to enjoy

6  equal access to the benefits and privileges of

7  employment."  Do you see that?

8  A   Yes.

9  Q   Is that the kind of request that Mr. Hopman was

10 submitting?

11 A   Mr. Hopman requested an accommodation based on his

12 report of having a disability, yes.

13 Q   But in terms of the -- yes, but is the second

14 bullet point here the reason that he wanted the

15 accomodation?

16 A   I'm sorry.  Can you repeat that?

17 Q   Is the second point, does that describe the basis

18 of him seeking an accomodation?

19 A   That was his basis for seeking an accomodation.

20 Q   Right.  Because he wasn't saying he couldn't do

21 the job, right?

22 A   No.  He told me he was able to perform the

23 essential functions of his job.

24 Q   But there's another reason, besides having trouble

25 performing the job, right, that's stated in the second

Page 37

1   Q   But if he had known the specific rationale,

2   wouldn't that have helped him to respond to any

3   concerns?

4   A   I don't know.

5   Q   Because you said it wasn't your place, but then

6   again, if that's what's motivating the employer, if he

7   doesn't know that, then he can't ever, you know,

8   respond and say look, you know, this is -- you're

9   looking at it the wrong way or anything like that

10  because --

11  A   I have had many conversations with Mr. Hopman

12  about what his needs are and what his concerns were.

13  And he did not ever express to me that he couldn't do

14  his job.

15  Q   Right.  And since he didn't, that was kind of

16  like -- that was the end of the story in a way because

17  he only deserves it, if he couldn't do his job, right?

18  A   That's not accurate from my standpoint.  I

19  advocated for him, just as I would have for any other

20  employee that might have had a more concrete need to

21  be able to perform.  My work with the employee is

22  based on what he feels he needs and what his request

23  is.

24  Q   Did I hear you say that you didn't think Perry had

25  a concrete need for the accomodation?

Page 74

1    go back to Mr. Hopman and say okay, these are fine,

2    but now we have some new reasons?  Were there new

3    reasons offered in 2017 to deny him the service dog?

4    A    No.  Not essentially, there were not new reasons.

5    Q    It all boiled down to supposedly lack of safety?

6    A    It boiled down to safety concerns, yes.

7    Q    Do you know if those are valid or invalid?

8    A    Do I know if they're valid?

9    Q    Right.

10             MR. GARLAND:  Objection, foundation.

11   A    I mean I don't.

12   Q    (By Ms. Butler)  I mean in other words, do you

13   have the knowledge of the railroad operations to be

14   able to say no, these are invalid concerns, or no,

15   these are very valid concerns?

16   A    No.  Not the --

17   Q    Because that's different.

18   A    Yes.

19   Q    That's in somebody else's purview?

20   A    Yes.  Not what's required about the movement of

21   the trains and all of that, that isn't my area.

22   Q    That's not your area?

23   A    No.

24   Q    And so then you did Exhibit 21 with the help of

25   Mr. Hopman?

Page 75

1    A    Yes.

2    Q    Did you show it to him before you sent it off?

3    A    Oh, yes.

4              (Whereupon, Weatherford Exhibit Number

5    22 was marked for identification.)

6    Q    (By Ms. Butler)  Then let me show you 22.  And is

7    22 the actual findings against Mr. Hopman?

8    A    This is the resolution of the accomodation

9    request.

10   Q    Right, which was the resolution that he did not

11   get the request?

12   A    He was denied his original request, yes.

13   Q    Now, it says on this form, Exhibit 22, that the

14   accomodation was approved, but different from the

15   original request.  Is that something that you filled

16   out or is that somebody else's work?

17   A    I filled this out.

18   Q    So you, in terms of how this was captured on any

19   paperwork, it would show that Mr. Perry Hopman

20   requested an accommodation and he got one, right?

21   A    He got --

22   Q    An accommodation.

23   A    Right.

24   Q    I mean the upshot would be yes, we gave him an

25   accommodation, correct?

PAPULINE WEATHERFORD          VOLUME 1          FEBRUARY 11, 2019

Page 78

1    Q    So getting back to Exhibit 18, which is the

2    Medical Comments History, if you start -- I guess you

3    have to start at the bottom of Page 3, Mr. Hopman

4    contacted you a number of times, correct?

5    A    You're asking me a question?

6    Q    Yes.

7    A    Yes.

8    Q    And then on May 10th, you reviewed the request in

9    detail and you completed this Form B, and you're going

10   to forward it to the DP&M?

11   A    Yes.

12   Q    So then the next thing we see is the 19th -- well,

13   no, on the 17th.  It says, "conference call today will

14   update."  What does that mean?

15   A    That I had a conference call.

16   Q    But do we know -- do you know who it was with?

17   A    No.

18   Q    Would you have any notes back at your office?

19   A    No.  I put it all in here.

20   Q    And then -- so then on the 19th, it says,

21   "Researched accomodation request and use of service

22   dog in this industry."  How did you do that?

23   A    I got online and looked up, tried to find cases of

24   service animals being used on the railroad, and tried

25   to find out other examples to help Mr. Hopman with his

Page 79

1   request.

2   Q   It says, "All parties reviewing ability to

3   reasonable accomodate request and alternatives."  Who

4   is that?

5   A   That would have been everybody involved in the

6   decision.

7   Q   And that's the people we don't know.  We don't

8   know who they were.

9              MR. GARLAND:  Objection, form of the

10  question.

11  Q   (By Ms. Butler)  Is that right?

12  A   I don't know all their -- every specific person,

13  no.

14  Q   Which persons do you know?

15  A   It would be EEOC, the safety people, probably

16  labor relations.

17  Q   Is this a result of a call or how do you know

18  everybody is reviewing the ability to accomodate?

19  A   Because through talking with EEOC, with my

20  manager, with my director about who was involved in

21  the decisions.  I just don't remember the names of

22  everybody that touched this case.

23  Q   Isn't that an important thing to document?

24  A   I don't have a -- I don't document the different

25  aspects of everybody else's position and what they do.

Page 82

1   where they're looking to see whether service dogs have

2   been used in the --

3   A   No.  That was what I was doing with Mr. Hopman to

4   help him with his argument with the superintendent.

5   What they're -- they were just researching their

6   aspect of their -- of the complaint and whether they

7   could -- and gathering all the people to make the

8   accomodation request.

9   Q   It doesn't say anything about reaching out to

10  other people, but that's what you think was inherent

11  in the June 2nd entry?

12  A   Yes.

13  Q   That there were other people, a bunch of other

14  people involved --

15  A   Yes.

16  Q   -- with the EEOC?  So June 5th, did he, did Mr.

17  Hopman on June 5th ask for an update?

18  A   Yes.

19  Q   And you discussed alternatives, such as a job

20  change?

21  A   Uh-huh.

22  Q   You suggested FMLA, right?

23  A   Yes.

24  Q   Is that because you knew that he was not going to

25  get his accomodation, the one he wanted?

Page 83

1   A   Yes.  We were coming up with trying alternatives

2   to help him be able to be successful.

3   Q   Did you tell him then that he was not getting the

4   accomodation or did you just try to talk to him about

5   other options?

6   A   I just discussed other alternatives with him.  I

7   did not know at the time that it wasn't going to be

8   approved.  I was just coming up with other options to

9   help him so he can continue --

10   Q   Where did you get those options?  I mean are those

11   something you came up with?

12   A   Uh-huh.

13               MR. GARLAND:  Is that a yes?

14   A   Yes.

15   Q   (By Ms. Butler)  Do you think what you discussed

16   with him on June 5th were reasonable accomodations?

17   A   Yes.

18   Q   So the job change, you're talking about working in

19   the yard, correct?

20   A   Right.  For him to make use of his seniority so he

21   didn't have to be away from home overnight, yes.

22   Q   And that would be a lower paying job, correct?

23   A   No.  That's not necessarily true.

24   Q   It's not better paying to be out on the railroad?

25   A   It depends on the job and the time and the hours

Page 87

1    maybe we ought to look at this again because we say

2    we're granting an accomodation that he didn't even

3    make?

4    A    No.  We granted him an accommodation to help him

5    address the issues with an alternative because we

6    couldn't grant what he wanted.

7    Q    Right.  But he said you guys are totally focused

8    on this sleeping issue.  That's not the long and short

9    of it.  I need this dog out with me on a daily basis.

10                Did anyone ever look back and say look,

11   we've closed this request, and sleeping is the only

12   issue, maybe we ought to look more broadly.  Did

13   anyone do that to the best of your knowledge?

14   A    No.

15   Q    And was that a mistake?

16   A    I don't believe so because the accomodations could

17   not be granted.  And I asked him specifically was he

18   able to do his job, was he having problems doing his

19   job, and he told me no.  Had he told me that he was

20   having any difficulties or problems, I would have

21   escalated further and we may have had to pull him out

22   of service.

23   Q    So again, the only way Mr. Hopman could get an

24   accomodation was to say he couldn't do his job?

25   A    He would have to have a need for that

Page 89

1    ability to function.  Mr. Hopman indicated to me that

2    he had no difficulties performing his job.  And

3    subsequently, was promoted.  So there was no -- there

4    was no performance issues and he did not disclose any.

5    Q   So if he doesn't disclose performance issues, he

6    doesn't get an accommodation?

7    A   Well, if you don't disclose that you have a need

8    for something, then no, there's not a way to grant an

9    accomodation for it.

10   Q   Isn't there some need described when he's talking

11   about the things that Atlas can do to help him during

12   the day?  Doesn't that establish some sort of need?

13   A   It did not.  It doesn't establish how it -- that

14   he needed the dog at work, no.

15   Q   Do you feel that you gave your best to help Perry

16   Hopman?

17   A   Absolutely.  I'm still working with him.

18   Q   And do you think he sees it that way?

19   A   I would hope so.

20   Q   He still hasn't gotten an accommodation.

21   A   No.  But I'm not the person that makes that

22   decision.  And unfortunately, UP was not able to

23   accomodate what he's asking for.

24   Q   And when you say they weren't able to accomodate,

25   that's not of your own personal knowledge.  You're

Page 113

1    a different order.  Why don't I just go copy it real

2    fast.

3                    THE VIDEOGRAPHER:  The time is

4    approximately 6:10 p.m.  We're off the record.

5                    (Recess from 6:10 p.m. to 6:11 p.m.)

6                    THE VIDEOGRAPHER:  The time is

7    approximately 6:11 p.m.  We're back on the record.

8                    (Whereupon, Weatherford Exhibit Number

9    25 was marked for identification.)

10   Q    (By Ms. Butler)  Exhibit 25, is this a series of

11   e-mails that you either sent to or received from Mr.

12   Hopman?

13   A    Yes.

14   Q    Let me get you to turn to Hopman 35.  This is

15   showing that his dog has been certified, correct?

16   A    This was completed per the requirements for the

17   service dog program.

18   Q    There's from Jordyn Miller?

19   A    Yes.

20   Q    Did you ever speak with her?

21   A    I don't believe I spoke to her directly.

22   Q    Did you speak with anyone whose involved in

23   training service dogs?

24   A    For Mr. Perry?

25   Q    Yes.

Page 143

1                IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF ARKANSAS
2

3    PERRY HOPMAN                    *
                    PLAINTIFF       *
4                                   *
     VS.                            * CIVIL ACTION NO.
5                                   * 4:18-cv-74-KGB
                                    *
6    UNION PACIFIC RAILROAD         *
                    DEFENDANT       *
7

8

9           I, Linda G. Boyko, a Certified Shorthand

10   Reporter in and for the State of Texas, do hereby

11   certify that the facts as stated by me in the caption

12   hereto are true; that the above and foregoing answers

13   of the witness, PAULINE WEATHERFORD, to the

14   interrogatories as indicated were made before me by

15   the said witness after being first duly sworn to

16   testify the truth, the whole truth and nothing but the

17   truth, and same were reduced to typewriting under my

18   direction; that the above and foregoing deposition as

19   set forth in typewriting is a full, true and correct

20   transcript of the proceedings had at the time of

21   taking said deposition.

22

23           I further certify that I am not, in any

24   capacity, a regular employee of the party in whose

25   behalf this deposition is taken, nor in the regular

PAPULINE WEATHERFORD          VOLUME 1          FEBRUARY 11, 2019

                                                      Page 144

1    employ of their attorney; and I certify that I am not

2    interested in the cause, nor of kin or counsel to

3    either of the parties.

4

5                  Given under my hand and seal of office

6    on this, the_____day of_____, 2019.

7

8

9

10

11

12                    _____

13                    LINDA G. BOYKO, Texas CSR, No. 712
                      Expiration Date:  4/30/2021
                      Firm No. 469
14                    607 Rustic Lane
                      Friendswood, Texas  77546
15                    713.521.1117

16

17

18

19

20

21

22

23

24

25