# EXHIBIT L



# Transcript of Rodney Doerr

**Date:** February 5, 2019
**Case:** Hopman -v- Union Pacific Railroad

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

1              UNITED STATES DISTRICT COURT

2             EASTERN DISTRICT OF ARKANSAS

3    PERRY HOPMAN,                    )Civil Action
                                      )Number:
4              PLAINTIFF,             )4:18-cv-74-KGB
                                      )
5    V.                               )
                                      )
6    UNION PACIFIC RAILROAD,          )
                                      )
7              DEFENDANT.             )TAKEN ON BEHALF
     ─────────────────────────       )OF PLAINTIFF
8

9

10

11

12        VIDEOTAPED DEPOSITION OF RODNEY DOERR, taken

13   before Cheryl A. Rooney, RPR, and General Notary

14   Public within and for the State of Nebraska, beginning

15   at 9:02 a.m., on February 5, 2019, at Welsh & Welsh,

16   P.C., L.L.O.; 9290 W. Dodge Road, #204, Omaha,

17   Nebraska.

18

19

20

21

22

23

24

25

Transcript of Rodney Doerr
Conducted on February 5, 2019                    2

```
 1                      APPEARANCES

 2   FOR THE PLAINTIFF:

 3   MR. JOHN W. GRIFFIN, JR., ESQ.
     MAREK, GRIFFIN & KNAUPP
 4   203 N. Liberty Street
     Victoria, TX 77901
 5   (361) 573-5500
     jwg@lawmgk.com
 6

 7   FOR THE DEFENDANT:

 8   MR. TORRY N. GARLAND, ESQ.
     SENIOR COUNSEL
 9   UNION PACIFIC RAILROAD
     1400 Douglas Street, Stop 1580
10   Omaha, NE 68179-1580
     (402) 544-3135
11   tngarlan@up.com

12   Also Present: Lisa Olsen, Videographer

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Transcript of Rodney Doerr
Conducted on February 5, 2019                          18

1    seriously injured or worse.  It also exposes the

2    public, based on the commodities that we carry, to

3    grave risk.  So we really are trying to drive

4    towards consistency with our rules.  While human

5    beings bring a lot of variability into anything, we

6    are really trying to get everybody to follow the

7    same process for any task on the railroad.

8         Q.   In terms of your position as assistant

9    vice president of safety -- is that what you said?

10        A.   There was another promotion in here.  I

11   was then promoted to VP, which is my current role.

12   So not only did I pick up the safety, but I also

13   picked up our special agents, which is our police

14   force for the railroad --

15        Q.   Yes, sir.

16        A.   -- as well as the environmental group.

17        Q.   Who had previously managed the special

18   agent segment of UP's business?

19        A.   My predecessor, gentleman by the name of

20   Greg Workman, who was on the VP safety job for about

21   four or five months.  And before that a gentleman by

22   the name of Bob Gromala, and he had been our

23   long-standing vice-president of safety for 15ish

24   years.

25        Q.   Are both of those gentlemen still with the

Transcript of Rodney Doerr
Conducted on February 5, 2019                    88

1   waived.

2        A.    That was through that accommodation

3   meeting that we had.  It was explained that he's

4   looking for the ability to lift the dog up into the

5   cab of the locomotive.  Again, there's this lifting

6   rule in place which would imply he would violate

7   that rule.  And I can't sign off on that.

8        Q.    Let me object to the response of this.

9   I'm trying to find anywhere in UP's documentation

10  where Mr. Hopman ever asked to be relieved from any

11  rule at Union Pacific in connection with his request

12  for an accommodation.

13       A.    I don't know that there was anything

14  documented with that request.  At least I don't

15  recall one.

16       Q.    After the meeting when this subject came

17  up, did the group ask to meet with Mr. Hopman to

18  discuss this concern that UP had about how the dog

19  would be transported from the ground and into the

20  train?

21       A.    This request seemed to come and go over a

22  period of time.  I think I was approached with this

23  concern, like, three times, at least that's my

24  memory.  Most recently here, mid-ish last year.  I

25  had a team that was going to fly down and meet with

Transcript of Rodney Doerr
Conducted on February 5, 2019                    89

1    Mr. Hopman to understand how he's going to mitigate

2    all of these rules, see how the dog would assess in

3    a true working environment, the yard in Little Rock.

4    And I had the tickets bought and everybody was

5    geared up, and the morning before they were supposed

6    to leave, the trip got abruptly canceled.

7    Apparently either Mr. Hopman had a problem or the

8    dog had a problem.  I never did hear what the issue

9    was.  That meeting was canceled, and to my

10   knowledge, never rescheduled.

11              MR. GRIFFIN:  I'm not fussing at you.

12   Let me object as nonresponsive.

13   BY MR. GRIFFIN:

14       Q.   After this meeting where you guys talked

15   about the issue of lifting and that sort of thing,

16   and that it might implicate some rules that UP has

17   in their GCOR rules, did UP make any effort at that

18   time to discuss this concern with Mr. Hopman?

19       A.   I don't know what others might have had a

20   conversation with him.  I know I didn't.

21       Q.   Do you know of anyone who did?

22       A.   I don't.

23       Q.   Would you say that UP does or does not

24   have an across-the-board rule about service dogs on

25   trains for engineers and conductors?

Transcript of Rodney Doerr
Conducted on February 5, 2019                90

1       A.    No hard, fast rule or policy.

2       Q.    Were there any other rules that UP is

3   referring to when it talks about not being willing

4   to waive any rules?  You talked about lifting.  Are

5   there more rules implicated that UP takes the

6   position would have to be abrogated in order to have

7   a service dog aboard a train?

8       A.    Yes.

9       Q.    What other rules are there?

10      A.    You had spoken about a shove.

11      Q.    A what?

12      A.    A shove.  Pushing the cars in front of the

13  locomotive, rather than pulling the cars.  That's

14  called a shove in railroad lingo.  That implies that

15  the employee in this case, Mr. Hopman as conductor,

16  would have to advance himself in front of the move.

17  That implies that he can't be distracted.  It's also

18  another rule in the rule book.  With a dog that he's

19  got to watch over, presumably with the dog with him,

20  that would counter that rule and potentially violate

21  it because he would have to keep an eye on the dog,

22  as well as the cars that he's trying to protect as

23  the car is being shoved.  That's another example.

24      Q.    Is it UP's position he has to be relieved

25  of that rule as well?

Transcript of Rodney Doerr
Conducted on February 5, 2019                    91

1      A.    Correct.

2      Q.    And again, that's something we don't see

3  in any of the documentation?

4      A.    Correct.

5      Q.    And same answer, following this meeting

6  where you guys were together but not with Perry,

7  would the group make any effort to speak with

8  Mr. Hopman about that concern?

9      A.    I did not.  Whether others did, I can't

10 answer.

11     Q.    Do you know of anybody who did?

12     A.    I understand his superintendent, that

13 would be Jay Everett, had had these conversations

14 with him.  He is the local supervisor.

15     Q.    He's the gentleman who has now moved to a

16 different area?

17     A.    Correct.

18     Q.    In terms of the role of engineer and

19 conductor --

20     A.    Yes.

21     Q.    -- are those two people supposed to be in

22 the locomotive any time the train is rolling?

23     A.    No.

24     Q.    How does that work?  Who is supposed to be

25 where when the train is rolling?

1    asking to waive or to create an exception to,

2    besides the three that we've already talked about?

3         A.   Those were the primary concerns as I

4    recall them.

5         Q.   Were there others that come to mind today?

6         A.   They're more in how the animal may affect

7    the other employee.  But your questions have been

8    specific to Mr. Hopman.

9         Q.   Not all of them, though.  Some of my

10   questions have been about UP's generalized concerns

11   about allowing service dogs aboard trains, right?

12   We've had some questions about that.

13        A.   I've interpreted it as Mr. Hopman, but

14   very good, we can certainly talk about how it might

15   affect another employee.

16        Q.   I think you and I agree that when we

17   talked earlier about a blanket rule, individualized

18   assessment, we went thoroughly about your thought

19   process about that?

20        A.   Yes, fair.

21        Q.   And can you share with us anyone at UP who

22   has engaged Mr. Hopman on these concerns that you

23   have just raised about these three specific rules

24   that UP has?

25        A.   I don't know specifically who spoke to

Transcript of Rodney Doerr
Conducted on February 5, 2019                    127

1        A.    I don't know.

2        Q.    Do you know why Union Pacific didn't

3   gather any information on this service dog team?

4   For example, counsel has reminded me that I have not

5   yet shared or asked you a question.  Are you

6   acquainted that the service dog that Mr. Hopman has

7   is named Atlas?

8        A.    Yes.

9        Q.    Then share with us why Union Pacific did

10  not conduct an individualized assessment of Atlas's

11  qualities and potential risks and benefits in the

12  accommodation framework.

13       A.    I don't know that we didn't.  That wasn't

14  the role of the safety department.

15       Q.    Why wouldn't the safety department be an

16  integral part of an individualized assessment about

17  the relative benefits and potential risks of an

18  accommodation such as a service dog?

19       A.    I think we would see this more in the

20  health and medical arena than per se the safety

21  operation of the railroad arena.  At least that's

22  the way that I think of these cases.

23       Q.    Why, though?  That's what I'm trying to

24  get at.  Why do you think of it in that way?

25       A.    Again, we get back to each case is unique

1          MR. GARLAND:   Objection.

2  BY MR. GRIFFIN:

3      Q.   They have no written guidance on that?

4      A.   No written guidance, yes.

5      Q.   And so if a -- did you say superintendent?

6      A.   Yes.

7      Q.   If a superintendent says, I've taken a

8  look at this dog, he's been trained to work, he's a

9  potted plant unless he needs to do something, is

10 perfectly safe, got ways to get on and off the train

11 without distracting anybody, and is doing a good job

12 for the worker, and that superintendent says, I

13 think I'm going to try this out, let him have his

14 service animal, does that abrogate or violate any

15 policy or rule at Union Pacific that you know of?

16     A.   That I know of, no.

17     Q.   Has any -- well, let me ask you this.

18          Do they violate any rule or policy at UP

19 for making that decision without coming to you or

20 your department?

21     A.   So our entire operating team is trained.

22 There are -- you either comply with the rule or you

23 don't.  There is no gray area.  If you're seeking to

24 have a rule changed or modified or a new rule added,

25 or deleted, then that is the purview of the safety

Transcript of Rodney Doerr
Conducted on February 5, 2019                                153

```
1   BY MR. GRIFFIN:
2        Q.   I want to try to find out this mentality
3   that the team is getting information from other
4   people who are relaying what they claim Perry is
5   saying in other circumstances.  Why is this level
6   of -- maybe you've already answered.  Why wasn't he
7   invited to the meeting?  I think you said you didn't
8   know, right?
9        A.   That's correct.
10       Q.   And I think going back to the bottom parts
11  of what you have -- that Union Pacific says that you
12  are an expert in, is infrastructure in place to take
13  care of an animal.  Do you see that?
14       A.   You're back on Exhibit 6?
15       Q.   Yes, sir.
16       A.   That is correct.
17       Q.   Okay.  Well, not to beat on you by any
18  stretch, but what infrastructure do you think are
19  required for trained service animals?
20       A.   So, much like the police, canine units
21  that we've talked about in the past where the
22  officer has to have an appropriate kennel, we have
23  no yard offices set up with kennels, watering
24  stations, defecation stations.  We don't have any of
25  that in our yards.  So that is what that sentence,
```

Transcript of Rodney Doerr
Conducted on February 5, 2019                    185

1      Q.   He didn't need the blessing of Union

2  Pacific to work in the yard, given his seniority,

3  did he?

4      A.   But the blessing was to stay in the yard.

5  So if another employee bumps him out of the yard,

6  displaces him, there was nothing to prevent that.

7  We put a cap on him to stay in the yard.  That was

8  the accommodation.

9      Q.   Okay.  In other words, he was entitled to

10  go there even if he didn't have a disability.  But

11  what I hear you saying, that they blessed him

12  staying there longer than he perhaps had a right to

13  stay?

14      A.   Absolutely.

15      Q.   Thank you for sharing that.  Okay, we're

16  on the same page.

17           Now, what about going back on the rail

18  again, back to his route?

19      A.   Thru-freight?

20      Q.   Okay.  Is that something that UP had to

21  bless, or did he have the right --

22      A.   He had the right.  But he chose to say,

23  no, I don't want your accommodation of staying in

24  the yard.  I want to go back to the road.  Which,

25  cool by us, he's got every right.

Transcript of Rodney Doerr
Conducted on February 5, 2019                    241

```
 1   checked.
 2        Q.   So he went in the yard for a period of
 3   time?
 4        A.   That's my understanding.
 5        Q.   And he chose to go back over the road?
 6        A.   Correct.
 7        Q.   When he worked in the yard, was he
 8   permitted to bring the dog into the yard?
 9        A.   I don't believe so.
10        Q.   Right.  So he worked without the dog?
11        A.   Correct.
12        Q.   When he went back into road service, was
13   he permitted to bring the dog on his trips?
14        A.   No.
15        Q.   That's another issue.  Let's say he was
16   working in road service and he was on a trip.  Let's
17   talk about Little Rock to Monroe, Louisiana.  He's
18   staying overnight at a facility; correct?
19        A.   Correct.
20        Q.   And it's not a UP facility; correct?
21        A.   Correct.
22        Q.   It's a hotel?
23        A.   Correct.
24        Q.   What if that hotel doesn't permit dogs?
25        A.   Then we've got another problem.
```

Transcript of Rodney Doerr
Conducted on February 5, 2019                                    262

```
1                    C E R T I F I C A T E

2           STATE OF NEBRASKA       )
                                    ) Ss.
3           COUNTY OF DOUGLAS       )

4                 I, Cheryl A. Rooney, Registered

5     Professional Reporter, General Notary Public within

6     and for the State of Nebraska, do hereby certify

7     that the foregoing testimony of RODNEY DOERR was

8     taken by me in shorthand and thereafter reduced to

9     typewriting by use of Computer-Aided Transcription,

10    and the foregoing two hundred sixty-two pages

11    contain a full, true and correct transcription of

12    all the testimony of said witness, to the best of my

13    ability;

14                That I am not a kin or in any way

15    associated with any of the parties to said cause of

16    action, or their counsel, and that I am not

17    interested in the event thereof.

18                IN WITNESS WHEREOF, I hereunto affix my

19    signature and seal this 11th of February, 2018.

20

21
          _____
22        CHERYL A. ROONEY, RPR
          GENERAL NOTARY PUBLIC
23        Registered Professional Reporter

          My Commission Expires:  November 24, 2022
24

25
```

General Notary - State of Nebraska
CHERYL A. ROONEY
My Comm. Exp. Nov. 24, 2022.