UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS

| | | |
|---|---|---|
| PERRY HOPMAN | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action Number: 4:18-cv-74-KGB |
| | § | |
| UNION PACIFIC RAILROAD | § | |
| Defendant. | § | |

**Plaintiff Perry Hopman's Response
to Defendant's Motion for Summary Judgment**

Union Pacific ("UP") asks this Court to ignore federal law and its own policies to deny a reasonable accommodation to a veteran who suffers from war-induced Post-Traumatic Stress Disorder ("PTSD").  UP claims that, if Perry Hopman can power through his PTSD symptoms and perform the discrete tasks of his job, it need not accommodate him.

UP is dead wrong.  Even UP's own reasonable accommodation policy recognizes that federal law does not limit accommodation to those who need help with the discrete tasks of a job. Federal law also requires job accommodations when they mitigate the symptoms of a disability and thus allow the worker equal access to the benefits and privileges of employment. Atlas, the service dog in this case, monitors Hopman and intervenes to prevent painful flashbacks from his war service. UP claims a pass under the ADA since Hopman has not failed to perform his duties. (Dkt. 54-1 at 2).  This is contrary to established law.  Because UP's motion is unsupported by the applicable law and the factual record, it should be denied.

**Factual Background**

This case is brought to compel UP's compliance with its duty of accommodating a decorated veteran with war-induced PTSD.   Perry Hopman wishes he had not witnessed what he saw on his tours of duty in Iraq and Kosovo. He wishes that the soldiers he cared for had not been mortally wounded. He wishes he had not come home with PTSD and that he did not need an accommodation.  That is not his reality.

Hopman has this war-induced disability because he served as an Army flight medic in Iraq and Kosovo. (Ex. A, Hopman deposition at 8-9; Ex. B, Hopman Dec at ¶3). A flight medic operates as a one-man flying hospital working to save soldiers injured on the battlefield. (Ex. B, at ¶3). In that role, he witnessed carnage and pain and suffering no human should endure, and he did so heroically. *Id.* After his service to the United States, he worked hard to overcome his injuries during a month of in-patient treatment at Walter Reed Hospital in Washington, D.C. and several months of in-patient treatment at the Oasis Center, the preeminent PTSD program in this country.  (Ex. A at 17-18; Ex. B at ¶ 4). He also received in-patient treatment at the Intrepid Center for both a traumatic brain injury and PTSD.  Hopman's war-induced injuries were so severe that he received a 100% disability rating from the Veterans Administration. (Ex. A at 101; Ex. B at ¶ 3).

**UP Stands in the Way of an Effective Tool
that Mitigates Hopman's Anxiety, Pain, and Suffering**

Hopman did not give in to his disability. Quite the contrary.  He worked hard to overcome it.  So when his treatment reached a point where his medical team recommended a service dog to help mitigate the flashbacks, anxiety, and migraine headaches he suffered, he pursued that treatment option. (Ex. B at ¶ 5). UP stands in his way.

2

Service dogs are expensive and it took Hopman time to get the money together to purchase and train the dog. (Ex. B at ¶ 5). The dog, Atlas, went through extensive training and suitability evaluation before being certified. (Ex. A at 106-107; Ex. C, UPHopman 856). Hopman did training too. *Id.* And, on April 10, 2017, the team of Hopman and Atlas were certified. *Id.* His trained service dog would, if not barred by UP, allow him to work his 12 hour shifts without the pain and suffering associated with flashbacks, migraine headaches, and without reliving the carnage he endured. (Ex. B at ¶ 7). He wanted to work without those burdens, as those without disabilities do. As he explained at the time, he didn't need the service dog to help him with discrete job functions, but to assist when he "is experiencing increased anxiety, fatigue and difficulties concentrating." (Ex. C, UPHopman 195).

His goal then and now is a workplace free of the serious barriers he faced because of his war-induced disability. Veterans such as Hopman understand that triggers (i.e., certain sounds and lights) induce flashbacks to the events of the past. (Ex. B at ¶ 7). Atlas is trained to monitor those triggers so that he can intervene and divert Hopman's attention from flashbacks and the pain accompanying them. *Id.*

That is not all. Atlas dog also assists in preventing the worst effects of migraine headaches, (Ex. A at 108-110), by recognizing the aura that precedes Hopman's migraines. (Ex. B at ¶ 7). Atlas then alerts Hopman, who self-administers a 10 mg. tablet of Rizatriptan, a prescription that mitigates the worst symptoms, (Ex. B at ¶ 7), by narrowing blood vessels in the brain, stopping pain signals from being sent to the brain, and blocking the release of substances that cause pain, nausea, and other symptoms of migraine.[1]

---

[1] Summary of diagnosis and treatment of migraines by the Mayo Clinic, found online at https://www.mayoclinic.org/diseases-conditions/migraine-headache/diagnosis-treatment/drc-20360207

**UP Ignored its Own Accommodation Policy, as well as Federal Law,
to Deny Hopman Equal Access to the Benefits and Privileges of Employment**

One glaring disconnect in UP's motion for summary judgment is its refusal to acknowledge that both its official policies and federal law recognize a duty to accommodate that is *distinct* from the duty to accommodate to help perform the essential functions.  UP's own policies state that it must accommodate to either assist with the essential functions, or "[w]hen an employee with a disability needs a reasonable accommodation to enjoy equal access to the benefits and privileges of employment." (Ex. C, UPHopman 226-227).  UP pretends this bedrock of federal law does not exist even when its own policy gives examples of accommodations that have nothing to do with performing the discrete tasks of a job.

This lawsuit arose because UP reflexively rejected Hopman's request for accommodation twice without the process its own policies mandate. (Ex. B at ¶ 8).  Each time, the decision-makers refused to speak with him, refused to permit him to explain how the accommodation would work, and refused to share their concerns with him, much less allow him to address them. (Ex. B at ¶ 8).

UP proceeded in direct violation of its own policy's requirement to "engage in the interactive process to clarify the needs of the individual making the request, and ask questions to try to identify the appropriate reasonable accommodation."  (Ex. C, UPHopman 226). Instead of any attempt to make things work, UP kept Hopman in the dark through the entire process until it issued a rejection of his request. (Ex. B at ¶ 8).

4

Here is how the process unfolded.

1. <u>The April 2016 Request and Denial</u>.

In 2016, Hopman made a request for a service dog before Atlas was fully trained because he wanted his proverbial ducks in a row when the training ended. (Ex. B at ¶ 9).  UP blithely claims Hopman said only that he needed the dog to be "more comfortable," (Dkt 54-1 at 1), but that is not what UP's documentation shows:

> He noted that having his service animal would help him both mentally and physically. He did not specify the specific functions of his service animal but noted that his service dog helps him in various ways. HOPMAN would like to be able to bring his service animal to work.

(Ex. C, UPHopman 264).

UP received Hopman's request for accommodation on April 1, 2016, and denied it only three days later.  (Ex. B at ¶ 9; Ex. C, UPHopman 197-198).  UP decision-makers acted without ever speaking to Hopman, without asking him any questions, and without allowing him to learn about their concerns.  (Ex. B at ¶ 9).  To this date, Hopman has never met or communicated with any of UP's decision-makers with respect to his request for an accommodation.  *Id.*

UP's records reveal three reasons for its rejection, although UP never evaluated Hopman or the dog:

1. "[T]he railroad environment is constantly shifting and changing - *it is unclear* how a service dog would adapt to moving box cars, locomotives and oftentimes loud and dangerous conditions posed by building, dismantling and servicing railcars and trains."  (emphasis supplied).  (Ex. C, UPHopman 197).  This would have been a proper basis for a question to Hopman, but UP refused to ask questions.  It just said no.  If it had engaged in an interactive process, it would have learned that Atlas is highly trained and would have no issues adapting to

the railroad environment. (Ex. B at ¶ 10)  It would also have learned that Atlas was specifically trained to respond to loud noises – because they are potential triggers –  by focusing on Perry. (Ex. B at ¶ 7).

2. "[T]here is no infrastructure in place to care for an animal, or to ensure that its bodily functions (urine/excrement) can be consistently cleaned in manner to prevent health concerns." (Ex. C, UPHopman 197). Again, UP did not ask whether Hopman would need infrastructure for Atlas or what the dog's bodily function needs were. If it had, it would have learned that Atlas needed no infrastructure and that service dogs are trained not to relieve themselves for 14 hours, which is longer than Hopman's 12-hour shift.  (Ex. B at ¶ 11).

3. "[T]he dog will remain unmonitored in this environment when the Claimant is performing his essential duties, and *may pose a risk* to co-workers." (Ex. C, UPHopman 197). (emphasis supplied). Again, UP chose total speculation rather than inquiring about the dog's training.  Atlas is trained as a tool and would not have been accepted as a service dog if he had any aggressive tendencies. If UP was engaging in good faith, it would have asked Hopman about the dog's training rather than assume the worst.  (Ex. B at ¶ 11).

A clear sign of the slap-dash nature of UP's response is this statement: "This is not an all inclusive list but provides few pertinent examples of why this accommodation should be denied." (Ex. C, UPHopman 197).  Hidden reasons signal the antithesis of a good faith process. They are a sign of a "heads I win, tails you lose" mind set.  A good faith process would have allowed Hopman to engage the concerns of the employer, with both parties being honest and forthright with the other and with the goal of assisting the worker.  But in this case, the matter was closed almost immediately and UP kept Hopman in the dark about any concerns it may have had until *after* it had denied his request. (Ex. B at ¶ 8).

6

    2.  <u>The May 2017 Request and Denial.</u>  In May 2017, after he and Atlas had completed their training and been certified, Hopman again asked UP for the accommodation.  (Ex. A at 37-38, 121; Ex. B ¶¶ 13-14; Ex. C, UPHopman 204).  He contacted UP employee Pauline Weatherford and asked again "for accommodation which would enable me to bring [Atlas] to work with me." (Ex. C, UPHopman 196).  In making his renewed request, he sincerely addressed the reasons that UP had given in 2016.  He shared the training, disabused UP of the concern that Atlas would have to interrupt the shift for bathroom breaks, and explained that Atlas was not aggressive and could not be certified with such a trait. (Ex. C, UPHopman 193-195).  Hopman, acting in good faith, volunteered that Atlas' trainer would be happy to meet with UP representatives to discuss the dog's training and his skills. (Ex. B at ¶ 10; Ex. C, UPHopman at 201-202).  Hopman further volunteered to provide a short orientation to employees to be sure they understood Atlas was a working dog, not a pet. (Ex. C, UPHopman 193-195, at 193).  UP ignored this input and simply said no, as it had done before. *Id.*  Little did Hopman know, but UP's Director of Safety had already "determined that it was not feasible to accommodate animals in the work environment of an Engineer."  (Ex. C, UPHopman 555-563, at 560).

    UP could have simply told him the truth, that UP felt that service dogs were incompatible with train work.  If UP had, Hopman could have addressed that.  It did not.  Nor did its decision makers meet with him or communicate with him in any way. (Ex. B at ¶ 15).  This failure to engage was especially lacking since the purported decision-maker, Jay Everett, was stationed in Little Rock just like Hopman.  (Ex. B, at ¶ 17; Ex. F, Everett Depo at 13, 20-21, 33).

In 2017, UP refused to offer any specific justification for its denial. (Ex. B, at ¶ 15). Instead of offering concerns or giving any reasons, UP simply declared that granting the accommodation might be a "direct threat."[2] (Ex. C, UPHopman 199).  If Hopman had known who was calling the shots, he could have gone to Everett's office to ask why UP refused to talk with him, rather than just labeling him a direct threat. But UP hid that as well.  (Ex. B at ¶ 17).

UP now claims that the accommodation Hopman sought would violate certain safety rules. (Dkt. 54-1 at 10; Ex. B at ¶ 18).  If there had been rules that might have been implicated, UP's policy required it to communicate that in the interactive process. (Ex. C, UPHopman 226-227).  UP admits that it has no rules barring dogs from its trains and yard. (Ex. E, Doerr Depo at 78, 128-130, 134-135, 138-139).  Yet, it expressed, once this litigation started, that people might be allergic to Atlas, that Hopman would be distracted by Atlas, that Atlas would be distracted by noise, and that Atlas's paws might get hurt walking on railroad ballast. (Ex. E at 90, 98, 110, 179-180).  These concerns would have been easily resolved had UP communicated its assumptions and interacted with Hopman, and considered its experience with its own dogs who are trained to work with its Special Agents.

For more than 25 years, UP has utilized its own dogs to protect its own property, and none of these dogs have ever caused the same sort of issues that UP assumed that a trained service dog.  (Ex. E at 245-247). Instead, it assumed problems for a service dog that did not exist with its own trained dogs.  Atlas is a trained working dog, not a pet or a center of attention. (Ex. B at ¶ 18).  As Hopman testified, "Atlas watches me. I don't watch Atlas."  (Ex. A at 135).  Had UP conducted an individualized assessment as required by law, it would have known this.  Its

---

[2] Although UP continually states that Hopman was a "direct threat," it did not plead this affirmative defense in this case and the time for adding claims and defenses expired long ago. This affirmative defense is not in the case. FRCP 12.

failure to do so is mystifying since UP owns dogs who work in and around train yards and locomotives.  (Ex. E at 156, 181-183, 247-249).

3.  <u>UP's Response to the 2017 Accommodation Request is More Like a Punishment than a Solution.</u>  In order to sanitize its second rejection of the accommodation request, UP claims that it was a noble employer and did the right thing by granting alternate equally effective accommodations: FMLA leave or working in the yard as opposed to conducting trains between Little Rock and Monroe.  (Ex. C, UPHopman 199).  There are serious problems with these "accommodations." FMLA leave would send him home without pay instead of accommodating his disability so he could work. *Id*.  And, as Hopman noted, he cannot predict his bad days anyway. (Ex. B at ¶ 19).

As for the transfer to the rail yard, that was not an accommodation at all, since Hopman had the right under his collective bargaining agreement to work in the yard, due to his seniority. (Ex. B at ¶ 19;  Ex. E at 117).  But more importantly, it does not address the reason Hopman asked for accommodation: flashbacks, anxiety and migraines he suffers during the workday.  UP claims that working in the yard would help Hopman since he would sleep at home.  (Ex. C, UPHopman 199).  Fair enough, but it did nothing to mitigate PTSD symptoms at work.

When UP rejected Hopman's request without any discussions with him, he asked if he could respond, and he did.  As he wrote, "I do not concur with the findings of the investigative team."  (Ex. C, UPHopman 202).  He explained that the accommodation offered "feels more like a punishment than a solution." *Id.*   And, most importantly, it did not address the reasons he needed accommodation:

> Atlas does more than just help with my sleeping, he is a medical necessity prescribed by a doctor to perform certain tasks that allow me to be a productive person. I feel the company is focused solely on the sleeping

> aspect, and not at all on the many other tasks the dog has been specificity
> trained to do for me.[3]

*Id*.

Hopman also directly addressed UP's conclusory statement that the service dog would be a threat in the workplace: "I'm unsure of exactly why it is believed that the medically prescribed service dog would pose a threat to safety for me, or others when he is specifically trained to do the opposite." (Ex. C, UPHopman at 202).

UP admits that it did nothing with this input from Hopman. (Ex. E at 181-183; Ex. F at 31, 34-35, 39-41; Ex. H, Weatherford Depo at 73-74, 76-77, 85-87, 114-115).  It simply filed it away, which is the antithesis of a good faith interactive dialogue.  Neither Doerr nor Everett ever reviewed Hopman's input about UP's rejection and supposed alternative effective accommodations.  (Ex. E at 181-183; Ex. F at 31, 34-35, 39-41).  UP never consulted with any medical specialist, much less specialists on PTSD. (*Id.*; Ex. F at 48-49).  UP never consulted with any service animal trainers or specialists. *Id.*

The sham process to which Hopman was consigned is not the interactive process disability law requires. On paper, UP recognizes what the law requires and promises to "ask questions to try to identify the appropriate reasonable accommodation" and to "clarify the needs of the individual making the request."  (Ex. C, UPHopman 226).  But UP did not keep its promises.  In fact, this case is a poster child for what happens when an employer walls off the decision makers from the worker with a disability.

---

[3]  UP also deliberately misstates Hopman's position on the June 2017 email he sent to Weatherford (Dkt. 54-1 at 11), suggesting that the need was largely divorced from PTSD. That is not what the document says.  It says "Overnight stays are not the sole need for the animal.  Yes I have PTSD which is part of the need for the dog.  But not the main focus." (Ex. C, UPHopman 928.)  Hopman was trying to explain why sleeping was not the only issue since that is the only issue UP was willing to discuss.

UP allowed Hopman to communicate with only one person, Pauline Weatherford, an employee in Houston who had no role in the decision making. (Ex. F at 38-39)   In 2017, her role was to write up his request and forward it to management. (Ex. F at 32-39; 45).  But she wrote it up wrong, even when he repeatedly told her that he needed an accommodation during the workday, not just at night. (Ex. B at ¶ 16).  Things only got worse from there.

Weatherford admits that she believed Hopman did not qualify for accommodation because he could do his job, (Ex. H at 35-36), but never told him that because it was not her "place."  (Ex.H at 36).  She shared with Hopman no specific concerns of management before telling him the request was denied. (Ex. B at ¶ 16). She did not ask him about how the dog would perform in particular circumstances. *Id.* at ¶¶ 16, 18 Her role was so divorced from the process that she has no idea if Hopman talked to Everett or not.  (Ex. H at 19).  She simply told him the ultimate outcome, filed away his input and response, and that was that. (Ex. H at 86-87).

UP obviously recognizes that it should have engaged in the interactive process and claims Hopman concedes its good faith.  (Dkt. 54-1 at 9).  Not so.  All Hopman shared was that Weatherford interacted with him, but he never claimed, as represented, that there was an interactive good faith process regarding his requests for accommodation.   He explained that the opposite occurred: the team that decided his case "relied on information that had nothing to do with me or my service animal." (Ex. C, UPHopman 202).  Weatherford is one of the people who bears responsibility for that.

11

4. <u>UP Uses Inadmissible Settlement Negotiations in a Misleading Fashion</u>. One of UP's more egregious claims is that it is still considering the possibility of providing Hopman a service dog as an accommodation. (Dkt. 54-1 at 14).  Of course, its Director of Safety has *already* concluded that service dogs are incompatible with railroad work.  (Ex. C, UPHopman 560; Ex. E at 90-91, 99).  That is UP's unvarying and inflexible position, confirmed by its demand that this Court deny Hopman's request as a matter of law.

Plaintiff's counsel has indeed tried to convince UP to reconsider its position after filing this lawsuit.  This is the kind of good faith attempt at dialogue that happens in every case.  UP's lack of good faith is shown by its admitted refusal to visit regarding Atlas' abilities with its trainer. (Dkt. 54-1 at 14).  If UP were open to changing its position on service dogs, it would not spurn information about Atlas's training and skills.

Moreover, these were settlement discussions.  Hopman never expected to see UP mischaracterize these talks in a dispositive motion in contradiction of  Federal Rule of Evidence 408.

UP stubbornly maintains its position that service dogs are incompatible with the job. (Ex. E at 73, 80-82).  It has repeatedly speculated that a service dog cannot adapt to the railroad environment.  (Ex. E at 90-91, 99; Ex. C, UPHopman 197-198).  Its claim that it is still open to it is one advanced only by counsel, not the company itself.

In similarly deceptive fashion, UP claims that it benevolently granted an accommodation for Hopman to bring Atlas to his engineer training class in Utah. (Dkt. 54-1, at 13).  Not so. The accommodation was granted by the community college where the training occurred, not UP. (Ex. B at ¶ 22).  In fact, Weatheford demurred when Hopman asked for UP's consent for him to bring Atlas to the training. *Id.*

12

UP is using inadmissible evidence and inaccurate statements to make its position seem more palatable, but its efforts to rewrite the record only confirm that judgment as a matter of law is not appropriate.

**Standard of Review**

Rule 56 of the Federal Rules of Civil Procedure limits summary judgment to cases where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  UP satisfies neither prong.  UP stakes its motion on its brazen statement that "Hopman did not need an accommodation." (Dkt. 54-1 at 2).  The overwhelming record evidence is to the contrary.  To be sure, UP presents no Rule 56 evidence that the service dog would not assist him with his PTSD.  No reasonable jury could find for UP on this point, yet it seeks judgment as a matter of law.

The moving party seeking summary judgment must present the facts in the light most favorable to the non-movant.  UP does the opposite.  As one example, it falsely suggests Hopman did not mention his PTSD in his EEOC Intake Questionnaire. (Dkt. 54-1 at 13).  Yet the record shows he did. (Ex. C, UPHopman 640-643, at 642.) Black is not white. It also misstates an email Hopman wrote after his second accommodation request was denied, falsely claiming he admitted that PTSD was not the main reason he requested a service dog. (Dkt. 54-1 at 24).  And it claims a large collaborative group considered Hopman's accommodation request, (Dkt. 54-1 at 10), when its record cite says nothing of the sort. This is a recurring issue and counsels against summary judgment.

UP also fails to support its position with legal authority and ignores the large body of law contrary to its position. It even apparently hopes this Court will ignore its accommodation policy (Ex. C, UPHopman 226), which it does not include in its Rule 56 evidence, and the weight of

13

evidence that forecloses summary judgment.  A party entitled to Rule 56 relief would address the actual record discuss the established statutory and case law.  Not UP.

### Argument and Authorities:
### UP Must Remove Barriers to Hopman's Equal Employment
### Through an Interactive Process with an Individualized Assessment.
### It Failed on All Fronts

Hopman brought this case to challenge UP's steadfast refusal to accommodate his disability.[4]  He did so because disability law goes further than just preventing discrete job actions[5] because of disability. It requires employers to take affirmative steps to remove barriers that would impede a worker with a disability.  Federal law provides redress for a worker when his employer fails to make

> reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity

42 U.S.C. 12112(b)(5).

The implementing regulations described the three areas where accommodations are required::

> (I) Modifications or adjustments to a job application process that enable a qualified applicant with a disability to be considered for the position such qualified applicant desires; or

> (ii) Modifications or adjustments to the work environment ... that enable an individual with a  disability who is qualified to perform the essential functions of that position; or

---

[4]  Hopman filed an EEOC charge in 2017 to challenge UP's refusal to accommodate and then timely filed this lawsuit. (Ex. C, UPHopman 204, 291).  He also filed an EEOC charge in 2016, but the EEOC advised him to withdraw it since Atlas was not fully trained at the time. (Ex. C, UPHopman 650-652).

[5] The Americans with Disabilities Act bans discrimination in "regard to job application procedures, the hiring, advancement, or discharge of employees..."  42 U.S.C. 12112(a).

(iii) Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

29 C.F.R. § 1630.2(o )(1).

The first two prongs are not at issue in this lawsuit, yet UP's mantra is that Hopman is not entitled to an accommodation to help him with the essential functions. UP ignores the "rest of the story," which is that employers must grant "accommodations that enable the individual with a disability to enjoy equal benefits and privileges of employment." 29 C.F.R. 1630.9, Appx. This is the basis of Hopman's claim.[6]  UP's own accommodation policy recognizes this as a proper basis for seeking accommodation, yet UP has chosen to leave that out of its motion.

Before determining whether a reasonable accommodation can be fashioned, the parties have to talk with one another – a process known in disability law as the "interactive process." UP's own policy explains that this means the parties must "clarify the needs of the individual making the request, and ask questions to try to identify the appropriate reasonable accommodation." (Ex. C, UPHopman 226). The Eighth Circuit agrees and has said that once the worker asks for an accommodation, "[t]he appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." *Fjellstad v. Pizza Hut of America, Inc.,* 188 F.3d 944, 951 (8th Cir. 1999) (citing 29 C.F.R. 1630 App. 1630.9).  That never happened.  And, as the Court explained in *Fjellstad,* that failure to engage in an interactive process has consequences.  It is "prima facie evidence that the employer may be acting in bad faith. Under these circumstances, we feel a factual question exists as to whether the employer has attempted to provide reasonable

_____

[6] Notably, UP does not attempt to show that this accommodation would impose an undue hardship.  (Dkt. 54-1 at 17).

accommodation as required by the ADA." 188 F.3d at 952. Summary judgment is not appropriate on this record.

To prevail, Hopman must present evidence he has a disability; is qualified for the job; and that UP failed to grant him a reasonable accommodation. *Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1112 (8th Cir.1995) (stating that once the plaintiff makes a facial showing that reasonable accommodation is possible, the burden of production shifts to the employer to show that it is unable to accommodate the employee). UP admits that Hopman has a disability and is a qualified individual. (Dkt. 54-1 at 20). But the railroad argues that Hopman's claim still fails because he does not need an accommodation, suffered no adverse action and his requested accommodation was *per se* unreasonable. These arguments are doomed because UP can argue them only by misstating federal law and ignoring its own accommodation policy and the underlying facts.

1. <u>UP Wrongly Claims Hopman Does Not Need an Accommodation</u>. First, UP assuredly tells the Court that Hopman must lose because he cannot prove he needs an accommodation. After all, as UP repeatedly says, Hopman is performing the essential functions of the job without accommodation. (Dkt. 54-1 at 17-20). It even goes so far as to say the accommodation he sought is unrelated to his condition.[7] (Dkt. 54-1 at 23).

To hear UP tell it, if Hopman can perform the discrete tasks of his job, no matter how difficult that is with his war-induced PTSD, he has no right to an accommodation. For more than 25 years, some employers have been making that argument, hoping to limit their duty to

---

[7] In making this conclusory statement, UP provides no authority to contradict Hopman's many statements to the contrary.

accommodate workers.  For more than 25 years, courts have unceremoniously rejected such arguments, since they are inconsistent with the statute.

### Every Circuit Court to Address the Issue has Rejected UP's Attempt to Deny an Accommodation Because the Employee Can Perform Essential Functions

UP cites a lot of cases, but not one that considers an accommodation to allow a worker to enjoy equal benefits and privilege of employment.  UP's authorities are off the mark because they uniformly address a different category of accommodations, ones that are needed to help a person perform the essential functions of their job. (Dkt. 54-1 at 17-18).  As far as Hopman can determine, no court has restricted accommodations to those that help a worker perform the discrete job tasks.

To the contrary court after court has rejected UP's position that its obligations are so limited.  An early case that made this point is *Buckingham v. United States*, 998 F.2d 735, 740–41 (9th Cir. 1993).[8]  There the Court plainly held that "employers are not relieved of their duty to accommodate when employees are already able to perform the essential functions of the job." Employees "who can perform all job functions" may need accommodation to allow them to "enjoy the privileges and benefits of employment equal to those enjoyed by non-handicapped individuals."  998 F.2d at 740.  Accordingly, a worker who sought relocation for medical treatment could not be hamstrung by his admitted ability to perform his job.

Other circuit courts have agreed. In *Sanchez v. Vilsack*, 695 F.3d 1174, 1181-1182 (10th Cir. 2012), for example, the Tenth Circuit rejected the Forest Service's argument that a worker did not qualify for transfer because she could still perform the essential functions of the job. Like

---

[8]  The same standards applicable in a case under the Rehabilitation Act, such as *Buckingham*, are applicable to claims under the Americans with Disabilities Act. 29 U.S.C. 794(d).

Hopman, Sanchez was able to perform the discrete tasks of the job.  She asked for a transfer to a different city where she would have greater access to specialized medical care and therapy after suffering an irreversible brain injury.

The Tenth Circuit observed that both the cases  and "the EEOC interpretive regulations contemplate accommodations that are wholly unrelated to the essential functions of a job." *Id.* at 1180-1182 (collecting cases). Thus, an accommodation can be appropriate "even if an employee is able to perform the essential functions of her job without it." *Id.* at 1182.

In  *Gleed v. AT & T Mobility Servs., LLC*, 613 F. App'x 535 (6th Cir. 2015), the Sixth Circuit concurred.  There, the plaintiff had a leg condition that caused him great pain when he stood for prolonged periods. He thus asked to be able to sit while working.  AT&T refused and insisted that, if Gleed was physically capable of doing his job – no matter the pain or risk to his health – then it had no obligation to provide him with any accommodation, reasonable or not. *Id.* at 538.

The Court disagreed and explained AT&T had misread federal law. "[T]he ADA's implementing regulations require employers to provide reasonable accommodations not only to enable an employee to perform his job, but also to allow the employee to 'enjoy equal benefits and privileges of employment as are enjoyed by ... employees without disabilities.'" *Id.* at 538-539. The Court recognized that the accommodation properly allowed the plaintiff to work without great pain – just as other employees did.  This is all Hopman seeks.

The Fifth Circuit has likewise rejected UP's skewed interpretation of disability law. In *Feist v. Louisiana, Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 453 (5th Cir. 2013), the Court reversed summary judgment in a case where the employer claimed it could reject a

request for on-site parking because the employee could not show the parking situation limited her ability to perform the essential functions of the job. The Court explained that the duty of accommodation was broader than that. 730 F.3d at 453. "[A] modification that enables an individual to perform the essential functions of the position is only one of three categories of reasonable accommodation." Another category of accommodation cited by the Court – and sought by Hopman – is to enable the worker to enjoy equal benefits and privileges of employment. *Id.*

The D.C. Circuit has also ruled out UP's construct. In *Hill v. Assocs. for Renewal in Educ., Inc*., 897 F.3d 232, 239 (D.C. Cir. 2018), *cert. denied*, 139 S. Ct. 1201 (2019), the Court rejected the notion that an employer could deny accommodation because the worker could perform the duties of the job, albeit with pain, without the accommodation. "A reasonable jury could conclude that forcing Hill to work with pain when that pain could be alleviated by his requested accommodation violates the ADA." 897 F.3d at 239.

The Seventh Circuit is yet another appellate court that has considered and rejected UP's argument to avoid accommodating Hopman. *McWright v. Alexander*, 982 F.2d 222, 227 (7th Cir.1992). "The Rehabilitation Act calls for reasonable accommodations that permit handicapped individuals to lead normal lives, not merely accommodations that facilitate the performance of specific employment tasks." *Id.*

19

Many district court cases are to the same effect,[9] but two stand out.  In the first jury trial in the country involving a veteran who sought a service dog to mitigate his PTSD, former D.C. Chief Judge Royce Lamberth, sitting in the Western District of Texas, quickly dispatched the argument UP makes here. The Court, relying on *Feist,* held that the accommodation may enable the employee to "enjoy equal benefits and privileges of employment" even if it has no effect on the employee's ability to do the job. "Substantial evidence at trial established that a service dog mitigated the effects of Alonzo-Miranda's PTSD by reducing the pain and hardship of his disability while at work."  *Alonzo-Miranda v. Schlumberger Tech. Corp.*, 2015 WL 13768973 at 2 (W.D.Tex. 2015).  That is exactly why UP owes Hopman an accommodation.

And in *Branson v. West,* 1999 WL 311717 (N.D.Ill. May 11, 1999), the district court granted partial summary judgment for a doctor who had been denied a service dog.  As in this case, Branson's VA employer was focused on her ability to do the job without a service dog. The Court rejected the VA's approach saying that the employer "viewed its obligations too narrowly."  1999 WL 311717 at *12.  Accommodations are warranted "when they help employees lead normal lives, not just when they facilitate performance of specific job tasks." *Id.*

Like UP, the VA in *Branson* offered no accommodation that would deal with the underlying issue:  the extraordinary fatigue and stress on her body suffered by this paraplegic doctor. The Court explained that this was not enough. "Changes that fail to address the

---

[9] *See, e.g., E.E.O.C. v. Life Techs. Corp.*, 2010 WL 4449365, at *4-5 (D. Md. Nov. 4, 2010); *Clark v. Sch. Dist. Five of Lexington & Richland Ctys.*, 247 F. Supp. 3d 734, 749 (D.S.C. 2017); *Kessler v. AT & T*, 2015 WL 5598866, at *12 (M.D. Pa. Sept. 22, 2015); *Merrill v. McCarthy*, 184 F. Supp. 3d 221, 238 (E.D.N.C. 2016).

employee's limitations are not accommodations and thus do not satisfy the employer's duty under the Act." 1999 WL 311717 at * 11.

Ultimately, UP's disagreement is with the law, not Hopman. It cannot redact away the duty of accommodation necessary to allow a person to enjoy equal benefits and privileges of employment. All Hopman seeks is the same right other employees already have – to work without the continual and unrelenting burden and pain of PTSD. He proposed a reasonable accommodation that entails no cost to UP. He even volunteered to educate his colleagues about how to treat Atlas.[10] (Ex. C, UPHopman 193).

UP's approach would punish qualified individuals with disabilities for being too determined and capable. Thankfully, disability law does not have such disdain for veterans.

2. <u>UP Wrongly Claims Hopman Was Not Denied an Accommodation.</u>  UP next claims Hopman must lose for he cannot present a prima facie case of discrimination because "he suffered no adverse employment action." (Dkt. 54-1 at 20). UP acknowledges that the failure to accommodate is itself an adverse action, but claims it offered him a reasonable accommodation in the form of a yard job and he "voluntarily" accepted it.[11] (Dkt 54-1, at 12). Again, UP ignores the factual record, which establishes that Hopman never felt that the yard was a reasonable accommodation, and only went there at UP's request. He then explained this to UP in 2017, telling it that the yard was worse than his regular route. (Ex. C, UPHopman at 202). He

---

[10] UP would not even have to change its policy with respect to service animals, because it has no such policy. (Ex. E at 129-130).

[11] As UP's own cited cases show, the Eighth Circuit requires no more than the statute requires, an employer's refusal to accommodate a known disability. UP admits this at one point but still claims that Hopman needs to show more than just a failure to accommodate. (Dkt.54-1 at 20-21). Curiously, its support is not an Eighth Circuit case but a *pro se* case from a district court of Missouri. Hopman is uncertain on what basis UP thinks this Court can overrule settled Eighth Circuit law based on nothing more than a district court case in which the plaintiff did not even have a lawyer.

21

said that the yard was " a more dangerous working environment" with "multiple stressors that my current job does not," (*Id.*)  but UP never responded.

When UP denied Hopman's requested accommodation in 2017, he wrote a heartfelt plea for the railroad to reconsider:

> Atlas does more than just help with my sleeping, he is a medical necessity prescribed by a doctor to preform [sic] certain tasks that allow me to be a productive person. I feel the company is focused solely on the sleeping aspect, and not at all on the many other tasks the dog has been specificity trained to do for me.

(Ex. C, UPHopman 202). He also addressed the underlying cause: UP's failure to engage in the interactive process:

> I truly believe that if the investigative team would have actually had the same type of in depth conversations with me and my dog trainer, a lot of the questions and concerns could have been addressed thus leading to a completely different outcome. Unfortunately, that did not occur and the investigative team relied on misinformation that had nothing to do with me or my service animal.

*Id.*   Hopman's statements directly contradict UP's claim that he "voluntarily" accepted an alternate accommodation.[12]  Indeed, less than a month after writing those words he filed an EEOC charge of discrimination to challenge UP's failure to accommodate him. (Ex. C, UPHopman 204).

UP's offer of a yard job cannot even properly be called an accommodation, because accommodations must be "effective." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 400–01 (2002).[13]  Hopman needed Atlas during the workday to avoid the pain of his PTSD – just as the employee in *Gleed* needed to sit down at work to avoid pain. UP refused.  And, as he told UP,

---

[12] UP's record support for this (Dkt 54-1 at 21 n.5), says nothing of the sort.

[13]  Employees do not always get their preferred accommodation, but the employer still has a duty to provide an accommodation that is effective. *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1137 (8th Cir. 1999).

the accommodation had another drawback, it placed him in "a more dangerous working environment" with "multiple stressors that my current job does not."  (Ex. C, UPHopman 202). Hopman needed an accommodation to prevent flashbacks and the pain and suffering they cause. UP's request that he go to the yard made it worse, not better.  As Hopman explained, "[I]t's a more stressful job." (Ex. A at 53-54).  Only a jury can decide whether proposing that Hopman either take unpaid leave or transfer to a "more stressful job" in the yard was an "effective" accommodation.

UP believes it can prevail because Hopman did comply with UP's request that he work in the yard job for a time. When the choice was between having his service dog at night or not at all, he went to the yard to see if it might work.  It did not.  As UP admits, he quickly shared that the yard was no accommodation but an additional burden on him. This shows just how ineffective this supposed "accommodation" really was.

3.  Hopman's Accommodation Was and Is Reasonable.  Finally, UP claims that Hopman's accommodation is unreasonable as a matter of law because he does not need it to perform the essential functions of his job. Again, UP displays the misunderstanding of federal law that pervades the motion.  To accept UP's argument one would have to spill white-out on the ADA, the case law, and UP's own policies.

The "reasonableness" of an accommodation is ordinarily a fact issue for a jury. *See Frye v. Aspin*, 997 F.2d 426, 428 (8th Cir.1993). And it should be here.  Hopman sought an accommodation that cost no money and violated no rule.  And UP gave Hopman no reason for rejecting his accommodation request that he did not effectively rebut.

Further, in this litigation Hopman has learned that another UP railroad worker effectively used a service dog for several years without any problem.  Paul Birchfield worked as a UP

23

engineer and, given the lack of any policy prohibiting dogs, brought a dog to work on numerous occasions, as his co-workers and managers all knew. Birchfield used the dog successfully to mitigate his anxiety disorder (Ex. G, Birchfield Depo at 16-24).  The fact that this accommodation worked for years speaks volumes about the reasonableness of the accommodation.

More importantly, UP actually uses its own dogs to assist its personnel on and around trains.  Its K-9 program pairs its special agents with dogs, and they work as a team to investigate misconduct, protect UP's property and personnel, and to find contraband. (Ex. C, UPHopman 502-512 at 502). UP recognizes that the dogs, "enhance agent safety and effectiveness." *Id.* at 503. It performs a "thoughtful and thorough individualized  assessment of both the dog and the handler before approving them." (Ex. E at 69).  No such assessment was performed for Hopman and Atlas.  (Ex. I, Genglar Depo at 81; Ex. E at 84, 113, 156).

As for UP's own dogs, in the more than 25 years UP has utilized dogs to accompany its Special Agents, none have caused any of the alleged problems that UP claims that service dogs would cause. No K-9 dog has misbehaved, caused any allergies, or engaged in any misconduct, according to UP's documentation. (Ex. E at 50, 110-113, 147, 186-189, 245, and 247).  UP is proud of using its own dogs to protect its property, (Ex. E at 49-50), yet reflexively denies a service dog to a veteran who needs one.  When asked why UP does not individually assess service dogs the way they assess their own dogs, Doerr, the Safety Director and Rule 30(b)(6) designee said "I don't have a good answer. I don't know why." (Ex. E at 113).

To date, UP has not explained its willingness to allow its own dogs to work with workers who have no disability, but to disallow service dogs to veterans who do.  When asked if UP has utilized its experience with its own dogs to determine whether or not service dogs might by

useful for railroad workers with disabilities, Doerr said, "I can't say that we have." (Ex. E at 71-72).  Again, UP shows why summary judgment is not appropriate.

UP ignores the *de minimis* burden on Hopman to establish the reasonableness of his request, laid out by the U.S. Supreme Court in *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002):

> a plaintiff/employee (to defeat a defendant/employer's motion for summary judgment) need only show that an "accommodation" seems reasonable on its face, i.e., ordinarily or in the run of cases.

535 U.S. at 400–01.

A reasonable jury could conclude that a service animal trained to treat a man with PTSD is a reasonable request coming from a man with PTSD, just as it did for veteran Alonzo-Miranda.  *See also United States v. Dental Dreams, LLC*, 307 F. Supp. 3d 1224, 1248-49 (D.N.M. 2018) (denying summary judgment on the "reasonableness" of an accommodation request for a service animal in-training for an employee with PTSD); *Clark v. Sch. Dist. Five of Lexington & Richland Ctys*., 247 F. Supp. 3d 734, 750-751 (D.S.C. 2017) (denying summary judgment regarding failure to accommodate claim where plaintiff suffered from PTSD and panic disorder with agoraphobia).  Hopman will offer expert testimony about the assistance service dogs offer to veterans without either any disruption or hardship to the employer.  (Ex. D).

**Conclusion**

For the reasons stated above, the plaintiff respectfully asks the Court to deny Union Pacific's motion for summary judgment.  No veteran should find his inner strength used against him in this manner.

Respectfully submitted,

/s/ Katherine L. Butler
TX Bar No. 03526300
Paul R Harris
TX Bar No. 24059905
Katherine L. Butler
Butler & Harris
1007 Heights Boulevard
Houston, Texas 77008
Tel. 713-526-5677
Fax. 888-370-5038

John W. Griffin, Jr.
TX Bar No. 08460300
Marek, Griffin & Knaupp
203 N. Liberty Street
Victoria, Texas 77901
Tel. 361-573-5500
Fax. 361-573-5040

Gregory G. Paul
PA Id No. 83334
409 Broad Street, Suite 270
Sewickley, Pennsylvania 15143
Tel. 412-259-8375
Fax. 888-822-9421

Counsel for the Plaintiff

**Certificate of Service**

I certify that a true and correct copy of this document has been served upon the defendant through the electronic filing system of the Eastern District of Arkansas on July 18, 2019.


/s/ Paul R. Harris